[No. 32671. Department One. April 6, 1954.]

ARTHUR HALDER, *Appellant,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent.*[1]

[1]Reported in 268 P. (2d) 1020.

*Lloyd Holtz* and *Max R. Nicolai,* for appellant.

*The Attorney General* and *Walter F. Robinson, Jr., Assistant,* for respondent.

HAMLEY, J.—Arthur Halder suffered a severe stroke on June 5, 1949. He claimed compensation under the workmen's compensation act for the resulting temporary disability and medical expense. It was and is his position that the stroke was caused by injuries sustained in an industrial

accident on May 28, 1949. The supervisor of industrial insurance rejected the claim upon the ground that Halder's condition was not the result of the injury alleged.

The supervisor's order was sustained by the board of industrial insurance appeals. Halder appealed to the superior court, where the case was tried before a jury. The jury returned a verdict in claimant's favor. The trial court, however, entered judgment n. o. v. for the department of labor and industries. Halder appeals.

Appellant was fifty-five years old at the time of the accident. For twenty-seven years prior to the accident, he had been employed in the pasteurizing department of the Hi-Grade Dairy, in Seattle, Washington. He testified that he had been in good health prior to May 28, 1949, with the exception of a back strain and a fatty tumor on his arm which had been removed in January, 1949. During the early morning hours of May 28, 1949, appellant, while engaged in his work, arose from a kneeling position and, with great force, struck the left side of the top of his head against a steel pipe protruding from the wall. He went back down to his knees again and was apparently dazed. The pain was severe, and blood was coming from the wound.

After holding his head a minute or two, appellant got up and applied first aid to the wound on his scalp. He continued with his work, but he testified that, during the remainder of the day, he suffered from dizziness and felt "sort of hazy." He also had a hard time concentrating on his work. Arriving home after work that afternoon, appellant continued feeling "whoozy," and went to bed early. He went to work the next day, although suffering from impaired vision and continued inability to concentrate on his work. Two days later, appellant suffered a pronounced dizzy spell, and continued to experience the other symptoms which have been described.

On June 5, 1949, while at work at the dairy, appellant suffered a severe stroke which completely paralyzed his right leg and arm and made it impossible for him to speak. He was hospitalized for one month, and then taken home.

He slowly recovered from the effects of the stroke, and in January, 1950, was able to take another job with his previous employer on a part-time basis.

Appellant had struck his head on this same pipe several times in the weeks previous to May 28, 1949. However, prior to that date he had never suffered any dizzy spells or eye blurs.

Medical testimony on behalf of appellant was submitted by Dr. John D. Collins, who had treated appellant from June 5, 1949, the date of the stroke, until his eventual partial recovery. In consultation with two neurological diagnosticians and one neurological surgeon, Dr. Collins diagnosed appellant's condition as being due to a cerebral thrombosis in one of the large cerebral vessels supplying the part of the brain which activates the right side. He testified that a thrombosis is not a hemorrhage, but is a clot. Asked to explain what may cause a thrombosis, Dr. Collins replied:

"Well, perhaps a roughening in the vessel, a slowing of the blood. In the main, we often don't know what causes it. Low blood pressure may contribute, inactivity, but those things obviously don't hold here. In the main, we really don't know what causes it."

A lengthy hypothetical question, not challenged on this appeal, was propounded to Dr. Collins, in which he was asked to assume the facts regarding appellant's previous medical history, the accident on May 28, 1949, the subsequent symptoms, and the stroke on June 5, 1949. He was asked specifically whether, assuming those to be the facts, he had an opinion based upon "reasonable medical certainty" as to whether or not there could be any connection between the blow received on May 28th and the stroke suffered on June 5th. His answer was "Yes." He was then asked whether it is "probable" that the blow caused the stroke. Again Dr. Collins answered in the affirmative.

Dr. Collins was then asked to outline how he arrived medically at the relationship between the accident and the stroke. The witness indicated that one factor which led him to this opinion was the fact that, unlike the average stroke,

appellant had premonitory symptoms in the form of dizziness, headache, and difficulty in concentrating prior to his stroke. Dr. Collins said he was not absolutely sure how long these premonitory symptoms had been experienced, "but at least for several weeks preceding his paralysis."

Another factor which influenced Dr. Collins was that, according to the patient, none of these symptoms had been experienced prior to receiving "these blows on the head." Dr. Collins then testified as follows:

"A. Well, I believe that the blow caused injury to the brain; presumably the brain was shaken in the bony skull, possibly. hard enough to have caused damage to a vessel, either hemorrhage or perhaps to have injured a vessel in some way so that a clot might have formed. The man is in his 50's, 54 or 55 years of age. We can presume that some hardening of the vessels is there. We know that to be present in practically all of us by that age. We know that blows on the skull cause not only direct pressure but that since the brain is in a fluid there is pressure against the opposite side of the skull, what we call contrecoup pressure, that it is very difficult to ascertain immediately how much damage is done, but if the vessels were brittle, or if they were stretched or pulled, a small hemorrhage might occur following such a blow. Q. And where did you think, in this case, it occurred? A. Well, from his findings, we would have to assume that it occurred in what we call—or near what we call—the internal capsule—that is where the motor nerves are brought together in a bundle for distribution down the spinal cord, and one side of the bundle supplies one side of the body, so that they would have to be in a narrow, confined place for the right face, arm and leg to be involved. Q. And was it a clot or hemorrhage into the area where these nerves that go into the right side of the body are involved that brought about the involvement? A. Sir, I don't know. I cannot answer. It might have been either. We concluded that it was a clot when we discharged him."

On cross-examination, Dr. Collins was questioned regarding the physician's report which he made to the department of labor and industries on July 20, 1949. In that report, in response to a question as to whether he believed the present condition was the result of the described injury, Dr. Collins had answered, "Equivocal." When asked at the trial

what he had meant by that, Dr. Collins replied: "I mean that it is questionable; I didn't know."

Dr. Donald E. Stafford, who testified for the department, expressed the opinion that it is extremely unlikely that the man's hitting his head on the pipe had any relation to the stroke. He attributed the stroke to arteriosclerosis. Dr. James Y. Phillips agreed with the views expressed by Dr. Stafford.

The sole question before us is whether there was evidence tending to establish a causal relationship between the head injury and the stroke which attained the degree of substantiality necessary to present a jury question.

Respondent concedes that Dr. Collins, in response to the hypothetical question, testified that there was a causal connection between the blow on the head and appellant's stroke. His answer to that question was, in effect, that in his opinion, based upon "reasonable medical certainty," it was probable that the blow caused the stroke. Respondent argues, however, that Dr. Collins' testimony, considered as a whole, is replete with inconsistencies and contradictions; that his explanations clearly show that his opinion was based upon speculation; that his opinion rested in part upon an erroneous assumption of fact; and, in effect, that it was outweighed by the testimony of respondent's medical witnesses.

In passing on a judgment n. o. v., the party moved against is entitled to the benefit of all testimony in his favor, and of all reasonable inferences to be drawn therefrom. *Ehman v. Department of Labor & Industries,* 33 Wn. (2d) 584, 206 P. (2d) 787. If, however, indispensable testimony is, in effect, retracted or completely negatived as a result of inconsistencies and contradictions in the other testimony of the same witness, that fact is to be considered in passing upon the motion.

We have examined each of the asserted inconsistencies and contradictions in Dr. Collins' testimony. None of them, nor all of them considered together, amounts to a negation or retraction of his testimony upon which appel-

lant relies. The witness remained firm in his opinion that the blow on the head was the probable cause of the stroke. Such inconsistencies and contradictions as there were may have affected the weight to be accorded Dr. Collins' opinion testimony. But this was for the jury to determine—not the court.

With particular reference to Dr. Collins' statement on the physician's report that the cause of the stroke was "equivocal," neither the jury nor trial court was entitled to regard this as substantive evidence. This was impeaching evidence which may reflect upon the witness' credibility. The substantive medical testimony was that which was received under oath at the hearing before the board of industrial insurance appeals. *Strmich v. Department of Labor & Industries*, 31 Wn. (2d) 598, 198 P. (2d) 181.

Opinion testimony as to causation is insufficient to support a judgment if it is expressed in terms of speculation or surmise, or if it is patently based upon speculation or surmise. This, we think, is the substance of the holdings in *Anton v. Chicago, M. & St. P. R. Co.*, 92 Wash. 305, 159 Pac. 115; *Boyer v. Department of Labor & Industries*, 160 Wash. 557, 295 Pac. 737; *Tonkovich v. Department of Labor & Industries*, 31 Wn. (2d) 220, 195 P. (2d) 638; and *Ehman v. Department of Labor & Industries, supra*, cited by respondent. On the other hand, *Hubert v. Department of Labor & Industries*, 39 Wn. (2d) 531, 236 P. (2d) 1042, cited by appellant, stands for the proposition that one having the affirmative of an issue does not have to make proof to an absolute certainty. As was said in the latter case:

"It is sufficient if the evidence affords room reasonably to conclude that there is a greater probability that an injury caused an existing condition to accelerate and result in additional disability than that such disability followed the natural and ordinary progress of the disease or condition with which the person was afflicted." (p. 535)

On this appeal, the parties have referred to the actual testimony received in these and other cases and to this court's appraisal thereof. This has been done in an effort to show that the testimony of Dr. Collins in the instant case

was or was not sufficient under the test set out above. We do not believe that such a detailed analysis of past decisions is particularly helpful here. There is rarely sufficient similarity between the testimonial patterns of any two cases to make this a profitable undertaking. The precedent value of these past cases, therefore, lies not in the particular appraisal which the court there placed upon the testimony received. Rather, it lies in the fact that certain principles were established which are to be applied in passing upon similar motions, whatever the testimony received in a particular case may be.

Dr. Collins' opinion that a causal relationship existed between the blow on the head and the stroke was certainly not expressed in terms of speculation or surmise. It was his opinion, based upon "reasonable medical certainty," that the blow was the probable cause of the stroke.

Was Dr. Collins' opinion patently based upon speculation or surmise?

It was his testimony that there is uncertainty in the medical profession as to the exact cause of cerebral thrombosis. His testimony also indicates that there was some uncertainty in his own mind as to exactly what physical reaction produced by the blow on the head resulted in the stroke eight days later. Nevertheless, it was his opinion that the blow probably caused the stroke. This opinion was based in part upon the fact that appellant had suffered significant premonitory symptoms, unusual in an ordinary case of stroke. There was also the fact that these symptoms had not been experienced prior to the blow.

More important, perhaps, was the fact that the severe blow was sustained on the left side of the head, which is where the thrombus affecting the right side of the body was located. Dr. Collins described the kinds of pressure and strain which such a blow could exert upon the blood vessels in the brain, and how it could cause the formation of a hemorrhage or clot. He conceded the possibility that the stroke was due to other causes, and indicated that he could

not be positive in his own opinion without resorting to delicate brain surgery.

In our view, this testimony does not warrant the court in saying, as a matter of law, that Dr. Collins' opinion as to causal relationship was based upon speculation or surmise. The cases are not many where a medical expert can describe, in positive and categorical terms, the precise bodily reactions whereby a particular trauma has produced a specific disability. Here the doctor expressed his opinion that such a result did occur, and explained one way in which this could have been brought about. We think this is sufficient to take the issue to the jury.

In describing appellant's premonitory symptoms, Dr. Collins testified that he was not absolutely sure how long they had been present, "but at least for several weeks preceding his paralysis." Dr. Collins was obviously in error as to this, as the accident occurred just eight days prior to the stroke, and no such symptoms were experienced prior to the accident. Respondent argues that this erroneous assumption of fact invalidates Dr. Collins' opinion testimony.

This error could have been, and probably was, considered by the jury in evaluating Dr. Collins' testimony. It is not, in our view, such a serious error of fact as to vitiate Dr. Collins' opinion testimony as a matter of law.

Finally, it is contended by respondent that Dr. Collins' testimony as to causal relationship is outweighed by that of respondent's medical witnesses. We are thus asked to look at the whole record and weigh Dr. Collins' testimony in the light of all the other evidence. If we did so, we would not be giving appellant the benefit of all testimony in his favor and of all reasonable inferences to be drawn from such favorable testimony. *Ehman v. Department of Labor & Industries, supra.* In urging us to consider respondent's medical testimony, *Petersen v. Department of Labor & Industries*, 40 Wn. (2d) 635, 245 P. (2d) 1161, is cited for the rule that in a case of this kind we will consider the entire record. As that decision reveals, however, we

will only search the entire record to find evidence which tends to support the verdict.

The judgment is reversed, and the cause is remanded, with directions to enter judgment on the verdict of the jury.

GRADY, C. J., MALLERY, FINLEY, and OLSON, JJ., concur.

---

May 28, 1954. Petition for rehearing denied.

[1]Reported in 268 P. (2d) 1006.