50 Wn.2d 699 (1957)
314 P.2d 439
JOHN E. McGUIRE et al., Appellants,
v.
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCAL NO. 470, et al., Respondents.[1]
No. 33807.
The Supreme Court of Washington, Department Two.
August 15, 1957.
Binns, Cunningham & Fletcher, for appellants,
Arthur R. Paulsen, for respondents.
DONWORTH, J.
This action was commenced by appellants, as partners, for the purpose of foreclosing two liens for architectural services rendered respondent union, aggregating the sum of $2,954.84, together with attorneys' fee for foreclosure in the amount of eight hundred fifty dollars. The Bank of California, N.A., was joined as a defendant, as a mortgagee of the real property involved, for the purpose of having appellants' liens declared to be paramount and superior to the mortgage lien held by the bank. It was stipulated by all parties that the bank, at the time of making the loan, had knowledge that appellants had begun to perform the architectural services.
The union and its officers (herein referred to as respondents) answered, admitting the existence of the contract for, and the performance of, the architectural services, and cross-complained, alleging that, as a "direct and proximate result of errors and defects in the plans and specifications prepared by the plaintiffs" (appellants herein), a certain retaining wall, designed by appellants, and hereinafter described, cracked and deflected abnormally from its designed vertical and horizontal position. The union sought five thousand dollars damages for the correction of structural weakness in the retaining wall and two thousand dollars for depreciation caused by the alleged necessity of constructing reinforced concrete abutments to keep the *701 wall in place. Appellants' answer to the cross-complaint consisted of a general denial.
The facts giving rise to this controversy may be summarized as follows:
The union owned certain property having a total of two hundred feet of frontage on the west side of Fawcett street between south Thirteenth and south Fifteenth streets in the city of Tacoma, upon which it desired to construct a union hall. The ground immediately to the west of Fawcett street rises abruptly from east to west. The alley to the west is approximately level with the top of the union hall, a two-story reinforced concrete building which was subsequently erected by the union on the south half of the property. Immediately to the north of the building a vertical retaining wall, approximately twenty feet in height, was designed and constructed on respondents' property parallel to the easterly edge of the alley for a distance of approximately ninety-five feet for the purpose of supporting the alley. The north half of the property was leveled near the base of the wall and paved for automobile parking use.
In January, 1954, appellants were retained by respondent union to prepare plans and specifications for the design of the union hall and the retaining wall.
Pursuant to this contract, plans and specifications were prepared by appellants, and a contract for construction was let June 3, 1954. Construction proceeded in due course; the building was completed and occupied by respondent union in March, 1955, the final inspection being made the following month.
The matters here in dispute relate only to the retaining wall.
In connection with the designing of the wall (and building), appellants engaged the firm of Smith & Murray, consulting structural engineers in Tacoma, who furnished engineering details which were incorporated into the plans and specifications prepared by appellants.
These plans and specifications called for the construction of a cantilever type vertical wall of reinforced concrete, which would deflect uniformly across the entire easterly *702 (open) face of the wall as the load which it was intended and designed to retain was applied and compacted behind its westerly face. Such normal and uniform deflection would vary, theoretically (according to all of the testimony of experts adduced on this point), approximately three quarters of one inch, or less, and allow the wall to retain its intended appearance of straightness in alignment, both horizontally along its uppermost edge and vertically across its easterly face.
The base, or foundation, of the wall was first poured; the vertical section, which was keyed to the base and fused to it by means of steel reinforcing bars extending upwards from the base and into the vertical wall forms, was poured subsequently, on July 1, 1954.
During the pouring of the concrete for the vertical section, some difficulty with form slippage was experienced, and shoring by means of two-by-four inch braces against the form panels covering the easterly face of the wall was necessary to return the form panels to alignment. The evidence discloses that this corrective shoring returned the forms to within approximately one half inch of alignment, but resulted in a bulge on the easterly face of the wall, and a misalignment of the uppermost edge of the wall, noticeable upon observation of the vertical plane of the wall by sighting along and downward from the top of the wall after removal of the forms.
About October 1, 1954, two diagonal cracks appeared on the easterly face of the wall, one at each end, commencing near the base of the wall and running upwards and inwards, toward the center, intersecting the top of the wall. (Shortly before these cracks appeared, a substantial portion of the backfilling material had been applied.) At that time the wall appeared to bow out, or arc, toward the east, approximately midway between its north and south ends. The top of the wall was out of horizontal and vertical alignment, with the upper edge of the wall overhanging the parking area immediately below and to the east.
Measurements were taken shortly after the cracks appeared and at different times thereafter under various *703 conditions as the weight was increased behind the wall. Between October, 1954, and January, 1956 (shortly before trial), the bow to the east had increased from approximately two and one half inches to approximately four inches at its maximum point. During the same period, the deviation of the wall from true vertical increased from approximately two and one half inches to in excess of three inches at its maximum point.
The evidence clearly shows that these deviations from the designed horizontal and vertical positions are abnormal. A part of the vertical deviation, however, consists of the normal and anticipated "deflection," together with a minor allowance for form slippage. The horizontal bow in the wall is entirely foreign to its intended appearance, but is partially due to form slippage occurring in the course of construction. Practically all of the deviations from alignment, both vertical and horizontal, are caused by the fact that the wall was constructed immediately against the existing building on the north end, and by the fact that respondent union's hall was subsequently erected against the south end of the wall. When the backfill was applied behind the wall, these restraints upon the ends of the wall caused the center to bow out, resulting in the cracking of the concrete at each end. These cracks and deviations from the designed alignment give rise to respondents' cross-complaint.
Numerous expert witnesses were called by the contending parties on this issue. Their testimony (comprising some 468 pages) was conflicting and involved the exposition of various engineering and construction theories. We see no need of setting forth the substance of it in this opinion.
At the close of the trial, the court rendered an oral opinion, which concluded as follows:
"Now a prospective buyer would further I think discount this property by a reasonable amount necessary to secure the wall. I am doubtful if any buyer on examining this wall or having checked any of the engineering appraisals, and you could be sure this would be done because undoubtedly this would be a commercial builder and not a residential builder, and I am doubtful if he would take the assurances *704 of the engineers as to the stability of the wall without computing at least the necessity and cost of making the wall secure in the mind of a layman.
"The defendant Carpenters have given estimate of what would be necessary to secure the wall by the construction of seven pilasters or buttresses. The estimate as to the depreciation on this property because of the defects in the wall is computed on the basis of the construction of seven pilasters together with the depreciation after the pilasters have been constructed. I don't think the Carpenters are entitled here to the computations of the value of seven pilasters because I think the wall is secure now. I think that probably if they sought to sell this property that the construction of two pilasters, since I find the wall now to be secure, the construction of two, one each in the area of the cracks, would be sufficient to assure any reasonably prudent buyer that the wall is sound and strong.
"While the evidence as to the cost of the construction of these pilasters is tenuous here based largely upon the estimate of Mr. Johnson, a builder, I think that an allowance of $1,000 would be adequate to enable the Carpenters to provide two buttresses to attach to the wall and give any reasonably prudent buyer the competent assurance that the wall is strong and sound, since I find it to be strong at this time.
"It would take some talking because the wall in its present appearance is curved, and most lay people, unless a wall is designed to be curved, would view with some minor degree of alarm a wall of this height which is curved; however I will accept and do accept the estimates of the engineers for the plaintiffs that the wall will hold, but it must in order to make the Carpenters whole, it must have the appearance of being strong as well as being strong, hence the allowance of the construction of two pilasters at $500 each.
"Now I suppose that in most instances this wall would have been true and straight and would have conformed exactly to its appearance in the drawings. There are many factors which contributed to this change of direction both from vertical and horizontal; possibly there was too much water added as it was being filled; certainly, the slip joint, the absence of the slip joint at either extremity contributed; perhaps it should not have been a cantilever wall; maybe that a wall of a different type, while more costly, would have withstood this pressure without any deviation whatever.
*705 "I think perhaps that the architect, since he assumes responsibility for the construction of this wall, was obliged to point out to the Carpenters the actions that should have been anticipated, to be anticipated in the construction of a cantilever wall; in other words, I think that he should have pointed out that a cantilever wall will move; he should have apprised them also of the possibility of building a different type of wall at possibly greater expense, I don't know, and given them the choice as to whether they wished to assume the uncertainties from a wall which would deflect at lesser cost or the certainties from a different type of wall which was designed not to move at all. However, there being no choice presented to the Carpenters, from the evidence it would appear that the decision for a cantilever type of wall was entirely that of the architect, all the Carpenters ordered was a straight, secure wall which would give no appearance of uncertainty or instability.
"Now it is the architect who must anticipate these pressures which are created during the course of construction. I mentioned two possibilities causing deflection that ought to have been anticipated. There is a third one; perhaps during the filling of this wall machinery of extraordinary weight was allowed to maneuver about and on top of the fill thus increasing the pressure against the wall suddenly. But these are things which the architect must anticipate, and not the owner.
"The architect must anticipate these and guard against them in his specifications. Indeed, he must since this is an alley, he must anticipate that not only were bicycles, motorcycles and vehicles traversing the alley which is supported by the wall, but he must build a wall which will withstand the pressure of steam rollers, heavy equipment of that character, because the city has a right to use its alleys for that purpose. So it is the architect who examines the terrain and the location and must prepare his specifications to meet the exigencies of the locality, and this wall was not designed to do so since this is a cantilever wall, one designed to move on the application of pressure arising from the backfill or movement of machinery in close proximity. If the wall were to withstand that pressure, it should have been designed to do so, or in the alternative, if it were not designed to withstand the usual pressures of heavy machinery maneuvering about the terrain in close proximity to the wall during the period of construction and backfilling, then the specifications should have cautioned the contractors or *706 should have defined the type of equipment that be brought into close proximity to the wall during the backfilling.
"In these respects, gentlemen, I find that the wall in so far as this particular property is concerned was defective. And the most eloquent evidence of it is its appearance. It does not have the appearance of a wall that was designed  it is crooked and it has a slight bulge, it has two marked cracks at each end neither of which can be explained by the normal action of concrete on being cured and dried. It departs from the vertical nearly three inches and from the horizontal nearly three inches in places and while I find that the wall is strong and secure, it nevertheless has through its appearance and the defects as outlined, has caused the defendant owners damage in the amount of $4,000, that is to say, $3,000 in depreciated value and an additional $1,000 allowed for the construction of the pilasters to bring the wall up to appearances which would assure a lay purchaser that the wall is secure.
"Now deducting  neither party has stressed the matter of segregating the architect's services from the construction of the wall, the relationship which the wall bears to the total cost of the building. Accordingly I find that the architect is entitled to his fee for the design of the wall. I would not enter into any arithmetic in trying to strike a ratio, consequently I find that the architect is entitled to his full fee of $2,954.84, that is without counsel fees inasmuch as the lien is not to be foreclosed, that the Carpenters have been damaged in the sum of $4,000, leaving a balance on their cross-complaint over and against the plaintiffs in the sum of $1,045.16. The demand for foreclosure of the lien is denied. The value of the lien is computed and deducted from a judgment of $4,000, leaving the defendants a net judgment over and against the plaintiffs in the sum of $1,045.16 together with costs and statutory attorney fees." (Italics ours.)
The court later entered findings, conclusions, and a judgment in accordance with its oral opinion. The judgment released appellants' claim of lien as an encumbrance on the property and awarded respondents recovery of only $1,045.16. This sum was arrived at by offsetting against the damages found to have been caused by appellants' furnishing defective plans (to wit, $4,000), the balance due appellants for architectural services (to wit, $2,954.84).
*707 As indicated in the oral opinion, the amount of damages ($4,000) was made up of two items:

 (a) Depreciation in market value of the property because
 of a prospective purchaser's fear of having to replace
 or substantially repair the wall .............. $3,000
 (b) The cost of constructing two buttresses to improve
 the appearance of the wall (not to prevent its
 collapse) ..................................... $1,000

Appellants' principal assignments of error are directed to the sufficiency of the evidence to support the findings of fact as entered, most of which support the conclusion of the trial court as to appellants' liability for negligence in their preparation of the plans and specifications, and the remainder of which pertain to the damages awarded. Appellants' assignments of error relating to the amount of damages awarded and to specific rulings and orders of the trial court need not be discussed, in view of the conclusion we have reached.
Several important factors must be borne in mind in determining the narrow issues presented. The predominant factor is that the trial court found that "the said retaining wall is secure and firm and will retain the alley," so that respondents' chief basis for recovery of damages has been eliminated from the case. There is neither allegation nor proof that the supervision by appellants was inadequate. The contractor is not a party to this action. Consequently, the only issue now remaining in the case is whether the evidence clearly preponderates against the trial court's findings that the unsightly cracks and misalignment in the wall were caused by defects in appellants' plans and specifications.
The trial court entered findings substantially as follows:
(1) That "the contractor built said retaining wall in accordance with the plans and specifications furnished" to respondents by appellants; (2) that the two prominent diagonal cracks near each end of the wall resulted from a failure to provide a slip joint, or positive separation, between the north end of the wall and the existing building adjoining to the north, which would permit normal deflection, *708 and in this respect the plans were defective; and (3) that the specifications furnished by appellants were defective in providing for "jet" filling behind the wall; that "it is improper engineering practice to specify jet filling for this type of wall; that the jet filling behind such a wall will cause the wall to be overloaded, and excess pressures to be applied during the backfill"; that the backfill was compacted by the constant application "of a stream of water from a three-quarter inch outlet during the entire time of the backfilling; that the application of this excessive pressure during the backfill was a proximate cause of the excessive deflection of said wall."
[1] Referring to the third finding outlined above, we think that the rule stated in Kingwell v. Hart, 45 Wn. (2d) 401, 404, 275 P. (2d) 431 (1954), is applicable and controlling. We there said:
"It is well settled that defendant, as respondent, is entitled to the benefit of all the evidence or inferences from it in support of the judgment, and that the findings of the trial court will not be disturbed on appeal unless the evidence clearly preponderates against them. But this latter rule has no application where, as here, there is no substantial dispute upon the facts, and the appeal turns upon the proper conclusions to be drawn from practically undisputed evidence. In such cases, this court has the duty of determining for itself the proper conclusion to be drawn from the evidence. Shultes v. Halpin, 33 Wn. (2d) 294, 306, 205 P. (2d) 1201 (1949), and cases cited."
See, also, W.L. Reid Co. v. M-B Contracting Co., 46 Wn. (2d) 784, 285 P. (2d) 121 (1955).
Assuming the specifications furnished by appellants to be defective in providing for "jet filling," it must be further shown that, as a result of compliance with such defective specifications, respondents sustained damage.
The evidence is not conflicting as to the meaning of the terms "jetting" or "jet filling." They mean complete saturation, or flooding, of the backfill material. There is no evidence tending to show that the backfill material at any time reached a point of complete saturation. In fact, all of the testimony on this point is to the contrary. However, *709 there is evidence that a constant stream of water from a hose having an inside diameter of three fourths of one inch was applied during the entire course of the initial backfill.
There is no evidence that the drainage facilities provided were inadequate. A heavy layer of coarse gravel was placed immediately against the west face of the wall. Behind the coarse gravel the backfill was composed of bank run gravel. Respondents' expert, Mr. Stevenson, a structural engineer, testified that the amount of gravel provided in the plans to be placed behind the retaining wall was more than he would require.
While there is evidence that jet filling would cause the wall to be overloaded, there is no evidence tending to show that the wall was, in fact, jet filled within the meaning of that term. The record is barren of evidence tending to show that the amount of water actually applied during the course of the backfill did, in fact, cause the wall to be overloaded. The trial court said in its memorandum opinion:
"Now I cannot find as a matter of evidence to what degree the material would have been compacted or compressed by the constant plying of a stream of water from a three-quarter inch outlet during the filling. We would have to have computations based upon not only the space factor but the time factor."
And, further:
"Now we have here a backfill occurring during an extended period of time during all of which time it appears that the water was flowing along and into the backfill without interruption. There was testimony that the stream ran constantly. The specifications did not fix the quantum of water per quantum of dirt, and perhaps the sudden application of this pressure as the backfill increased caused the wall to move more abruptly than it had been engineered to move." (Italics ours.)
[2] We conclude that there is no evidence to support the finding that "the application of this excessive pressure during the backfill was a proximate cause of the excessive deflection of said wall." Here, we do not have occasion to apply the rule that the evidence clearly preponderates against the finding because, actually, there is no evidence *710 whatever to support the finding that excessive pressure during the backfilling proximately caused the deflection of the wall.
[3] With respect to the second finding of fact outlined above, we are met with the well-established principle that the trial court's findings of fact, entered upon conflicting testimony, will be accepted as the facts of the case, unless we can say that the evidence preponderates against such findings. Brooks v. Warner, ante p. 99, 102, 309 P. (2d) 757 (1957), and cases cited.
Respondents' expert witness Stevenson testified as follows:
"Q. Do you have an opinion as to the cause of the cracking in the wall, the diagonal cracking? A. Yes. Q. And what is that opinion? A. Well, primarily cracking is, in my opinion, due to the fact that the wall was poured on the north side, was poured directly against that existing wall, without any attempt made to permit the wall to move, have free movement."
(The witness' reference to the "existing wall" meant the wall of the Crescent Ballroom located on the abutting property in which respondent union had no legal interest whatever.)
Several of appellants' experts attributed the existence of the cracks to the fact that both ends of the wall were restrained. Respondents' witness Stevenson later in his testimony, on cross-examination, in discussing the deflection of the wall, responded to questioning as follows:
"Q. Would it also be your opinion  on assumption that both ends of this wall are or at the time of the initial loading were to some degree bound against the adjacent structures to the north and adjacent structures to the south? A. Yes. Q. Upon loading would you describe the nature of the lines which this wall would take? A. If it were bound? Q. Yes. A. I would say it would take pretty much the line that it has taken, gone out, it would move very little at the ends, and then bow out in the middle." (Italics ours.)
[4] The hypothetical question posed to Mr. Stevenson, which formed the basis of the first opinion above quoted, was devoid of reference to the material fact that both ends *711 of the wall were restrained. In Arthurs v. National Postal Transport Ass'n, 49 Wn. (2d) 570, 578, 304 P. (2d) 685 (1956), we said:
"Hypothetical questions must be based upon the facts of the case, and the erroneous assumption of a material fact destroys the probative value of an expert opinion given in answer to the question. Rode v. Department of Labor & Industries, 47 Wn. (2d) 619, 289 P. (2d) 354. To have this effect, however, the fact must be material. See Halder v. Department of Labor & Industries, 44 Wn. (2d) 537, 268 P. (2d) 1020."
The testimony of Mr. Stevenson, last above quoted, being based upon the assumption that both ends of the wall were restrained, tends to clarify the apparent conflict and manifests an opinion in consonance with the testimony of appellants' experts, viz., that the crack at each end  although appearing almost simultaneously  was caused by the restraining force exerted against each end by the respective adjacent structures.
[5] In view of the physical facts and their respective causes as explained by the many experts, we are constrained to conclude that the evidence preponderates against the finding that both cracks were caused by the restraint exerted against the north end of the wall.
There remains to be determined the question of appellants' liability for the unsightly crack at the north end of the wall, since there is evidence that this crack was due to the fact that the north end of the wall was restrained.
There is a conflict in the opinion testimony of the experts as to whether the plans in fact call for the wall to be a free-standing structure. The trial court resolved this conflict in favor of respondents. But the determination of the trial court on that question is not decisive of the ultimate issue of whether the wall was constructed according to the plans, assuming them to be defective in failing to specifically provide for a positive separation at the north end of the wall.
By the first finding of fact outlined above, the trial court found that the wall was constructed in accordance with plans and specifications. Bearing in mind the rules set out *712 in the Brooks case, supra, and the Shultes case, supra, the salient and undisputed facts show: (1) That respondents owned property aggregating exactly two hundred feet in overall length from its north to south property lines; (2) that the plans furnished by appellants clearly show the proposed overall length of the union hall and adjoining wall to be exactly two hundred feet; (3) that the plans clearly show that the wall was to end at the north property line as established by survey; (4) that the length of the union hall and adjoining wall, on January 12, 1956, was in fact two hundred feet two and one half inches, with an additional one inch being allowed between the south wall of the union hall and the south property line; (5) that the retaining wall, as constructed, encroaches three and one half inches upon the property of the abutting owner to the north.
[6] These facts compel the conclusion that the wall would have been free standing, but for the fact that, as constructed, it does not end on the north property line of respondents as called for in the plans. Had the wall ended at the north property line, there would have been a three and one half inch separation between the north end of the wall and the building on the abutting property to the north. Can it be said that the architects were negligent in failing to describe on the plans a positive separation between the north end of the wall and the adjacent building on property which respondents did not own? Would the contractor, under such plans, be justified in assuming that he had a license to trespass upon the abutting property and construct an encroachment thereon, particularly where a survey showed that the north line of respondents' property was exactly two hundred feet north of the south boundary and the plans clearly provided for the construction of a structure having an overall length of exactly two hundred feet? We think not.
Certain admissions attributed to appellants are the strongest evidence in support of the trial court's finding on this point.
Appellant Muri, when called by respondents as an adverse witness, in response to the very general question whether *713 the wall was "built according to the designs, plans and specifications as prepared and furnished" by his firm, answered affirmatively. This statement is not conclusive of the fact, but is simply cumulative testimony to be considered with all other evidence bearing on this matter. Mr. Muri later clarified his answer in detail. A similar admission made by Mr. Muri at a conference with respondents shortly after the cracks first appeared in the wall is, likewise, not conclusive. It is clear that at the time the latter admission was made, Mr. Muri was acting as an arbiter between the contractor and respondents, and, being satisfied that the wall was strong and secure, irrespective of the unsightly cracks on its face, was reluctant to declare that the wall did not conform to the plans and specifications to the extent that its condition would require condemnation. These admissions, when considered in their proper settings, tend to indicate Mr. Muri's belief that there had been a substantial compliance with the plans and specifications and that any minor deviations would not, in his opinion, warrant a conclusion that the wall was failing. As previously pointed out, the trial court found that the wall would not fail, and hence that issue is no longer involved in the case.
[7] The uncontroverted physical facts require the conclusion that the wall was not constructed according to plans and specifications in two material respects: (a) At the south end no caulked cleavage joint was installed, and (b) at the north end the wall encroached three and one half inches on property owned by strangers to this action, and was attached to the Crescent Ballroom situated thereon. The two cracks in the wall and its misalignment were due to this failure to follow the plans and specifications prepared by appellants. No factual basis has been shown for finding that appellants are legally responsible for the unsightly appearance of the wall. Hence, the trial court erred in awarding respondents any damages for depreciation in the value of their property or the cost of constructing two pilasters to improve its appearance.
Since respondents have failed to establish that their damages were proximately caused by defects in the plans and *714 specifications furnished by appellants, the judgment is reversed and the trial court is directed to dismiss respondents' cross-complaint, to foreclose appellants' lien, and to determine and allow appellants reasonable attorneys' fees, both in this court and the court below, in accordance with the stipulation of the parties on file herein.
HILL, C.J., SCHWELLENBACH, and FOSTER, JJ., concur.
ROSELLINI, J. (dissenting in part)
I dissent to that part of the majority opinion which holds that there is no evidence in the record to support the trial court's finding that
"... the plans and specifications as prepared by the plaintiffs were defective, in that there was no provision for the free movement of said wall, as the plaintiffs failed to provide a slip joint at the north end of said wall; that said wall was designed to be solid against the existing building at the north property line of said wall."
The appellant Muri admitted, on cross-examination, that the plans failed to provide for a slip joint. I quote from his testimony:
"Q. Do the plans and specifications as furnished by your firm to the Carpenters Union show any separation or joint of any kind? A. There is no markings to say that we say there is to be a slip joint in there, no. Q. Is there any marking or indication that there is to be any other kind of a joint than a solid joint. A. I have to go back and say that taking the overall dimensions of our building and wall are 200 feet. Q. I realize that. But your plans and specifications show the existing building on the north end of the property line, is that not correct, Mr. Muri? A. Yes...."
A structural engineer, called as an expert witness, testified that the cracking was due to the fact that the wall was poured on the north side directly against the existing wall and that, in his opinion, the plans were defective in that respect.
The wall designed by the appellants was a cantilever type of wall. For such a wall to function properly and measure up to its designed strength, it must be free to deflect a normal amount. The evidence clearly shows that the deviations from the designed horizontal and vertical positions *715 were abnormal because the ends were not free to deflect. The wall, therefore, was not a true cantilever wall. While it is true that, had the wall been constructed only two hundred feet in length, as it was designed, space would have been left for deflection, it is also true that the design prepared by the appellants showed the wall flush with the adjoining building. In other words, the plans were not properly drawn to show the slip joint which would result if the wall were only two hundred feet in length. In this respect, to say the least, they were misleading.
Where there is substantial evidence to support the trial court's findings, they will not be disturbed on appeal. If the findings support the conclusions of law and judgment, that judgment must be affirmed. These rules are so familiar as to require no citation of authority.
The liability of an architect for defects such as this is stated in 25 A.L.R. (2d) 1086:
"By his contract, the architect implies that he possesses the necessary competence and ability, including taste, to enable him to furnish plans and specifications prepared with a reasonable degree of technical skill, and such as would produce, if followed and adhered to, a building of the kind called for, without marked defects in character, strength, or appearance. This skill and ability which he is bound to exercise are such as are ordinarily required of architects, which is a higher degree than that required of unskilled persons."
Upon its finding that the plans were defective in that the appellants had failed to provide for a slip joint, the trial court was justified in concluding that the architects had failed to exercise the requisite degree of skill.
However, only a part of the depreciation was due to this defect. I would remand the case with instructions to the trial court to determine the amount of damage attributable to the failure to provide for a slip joint on the north end of the wall and offset that amount against the amount due the appellants.
November 14, 1957. Petition for rehearing denied.
NOTES
[1] Reported in 314 P. (2d) 439.