# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| LORIANN HULL, | ) | No. 74413-5-I |
| Appellant, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| PEACEHEALTH MEDICAL GROUP, | ) | UNPUBLISHED OPINION |
| Respondent. | ) ) ) | FILED: September 26, 2016 |

2016 SEP 26 AM 9: 36
COURT OF APPEALS
STATE OF WASHINGTON

SPEARMAN, J. — While employed at St. Joseph Hospital PeaceHealth Medical Group (PeaceHealth) or shortly thereafter, LoriAnn Hull began to feel pain in her shoulders. This led to surgeries for thoracic outlet syndrome which resulted in significant complications that continue to plague her. Four years after the surgeries, PeaceHealth challenged the Department of Labor and Industries' (Department) determination that Hull's employment caused thoracic outlet syndrome. The trial court found that Hull's condition was not caused by her employment. On appeal, Hull contends the trial court's finding is not supported by substantial evidence. We agree and reverse.[1]

---

[1] Subsequent to withdrawal of her counsel, appellant submitted a number of documents including a letter, email exchanges between her and PeaceHealth, medical records, and other documents. To the extent these documents were not already a part of the record on appeal, we do not consider them because they are untimely.

## FACTS

Appellant LoriAnn Hull worked for St. Joseph Hospital PeaceHealth for 20 years as an admitting representative in the emergency room. Her duties included gathering patient information, inputting information, pulling forms and patient charts, affixing labels to documents, assembling and breaking down charts, sorting and stacking documents in piles, and cleaning name badges. These duties involved reaching over an arm-length away at waist level, reaching for items at or above her forehead, writing on paper, and typing on a computer.

Hull filed a worker's compensation claim on October 23, 2006 after experiencing elbow discomfort, aggravated by repetitive motion at work. She had difficulty bending and extending her arms. The Department issued an order allowing her claim on December 3, 2007. It did not specify the conditions allowed.[2]

On November 7, 2006, Hull saw her primary care provider, Dr. Hughes, who diagnosed her with left and right medial epicondylitis, a condition of the tendons in the elbow. Dr. Hughes saw Hull again on January 12, 2007. The elbow diagnosis remained the same and she was referred for electrodiagnostic studies. These were performed on February 9, 2007 and were normal.[3]

---

[2] The record does not include Hull's claim or the Department's order. However, a jurisdictional history to which the parties stipulated at hearing "for jurisdictional purposes only" includes information about the Department's December 3, 2007 order. Clerk's Papers (CP) at 94.

[3] A normal electrodiagnostic test does not rule out thoracic outlet syndrome. Thoracic outlet syndrome potentially shows up on an electrodiagnostic test only if it is serious. Intermittent thoracic outlet syndrome can result in a normal study. While an electrodiagnostic test is frequently used in the diagnostic process for thoracic outlet syndrome, it is not, by itself, helpful in ruling in or out the diagnosis.

Hull continued to work. To avoid pain, she adjusted her motions. To reach for something, she twisted her shoulder towards it so to avoid extending her arm fully. Hull began to feel pain in her left shoulder in March 2007. She continued to work at PeaceHealth at least through that date.

Hull saw Dr. Hughes again on July 9 and 26, 2007, reporting that she had pain in her left shoulder. Hull was referred to an orthopedic surgeon for the shoulder problem. She tried non-invasive treatment such as physical therapy, but ultimately had acromioplasty surgery on her left shoulder in October, 2007.[4] It did not resolve the problem. Hull attempted to return to work after that surgery.[5] With her left side immobilized from the surgery, she began feeling pain in her right shoulder.

Because acromioplasty surgery did not resolve her pain, Hull was referred to a thoracic outlet syndrome specialist. Thoracic outlet syndrome refers to three separate types of conditions in which either the artery, the veins, or the nerve are compressed at one of several sites in the body. Neurogenic thoracic outlet syndrome, Hull's condition, arises where the nerves that pass through from the spinal cord and the neck out to the arms are compressed. Neurogenic thoracic outlet syndrome is characterized by steadily worsening pain, numbness, tingling, and weakness in the shoulder, neck, arm, and hand.

---

[4] The record does not explain the nature of this procedure.

[5] Hull's full work history is not in the record.

Hull saw a thoracic outlet specialist, Dr. Johansen, on March 24, 2009. She reported steadily worsening pain, numbness, tingling, and weakness in her left arm and described her working conditions and onset of symptoms. Dr. Johansen reviewed prior testing and did a physical examination. One of the prior tests that he considered was a scalene block – an anesthetic procedure that temporarily relieved Hull's symptoms - which is an accurate and specific test for thoracic outlet syndrome. The effectiveness of the scalene block demonstrated that Hull had thoracic outlet syndrome. Dr. Johansen diagnosed Hull with neurogenic thoracic outlet syndrome based on workplace repetitive motion injury, appropriate story, symptoms, physical examination findings, and a strongly positive scalene block.

On April 22, 2009, Dr. Johansen performed surgery on Hull to correct the thoracic outlet syndrome. It did not resolve the symptoms. He performed a second surgery on December 21, 2009. This surgery resulted in significant complications, including balance problems, breathing problems, difficulty swallowing, dry heaving, and emotional problems including adjustment disorder with depressed mood.

In 2013, the Department issued three orders that directed PeaceHealth to pay for complications from Hull's thoracic outlet syndrome surgery. Those orders, which are the subject of this litigation directed PeaceHealth to pay for post-surgery complications including pulmonary conditions, balance problems, dysphasia, cricopharyngeal spasms, and adjustment disorder with depressed mood. They also directed PeaceHealth to pay for the psychiatric medication

Cymbalta. PeaceHealth appealed these orders to the Board of Industrial Insurance Appeals (Board).

The appeal proceeded to an evidentiary hearing before an Industrial Appeals Judge (IAJ) on May 23, 2014. Hull's attending physician, Dr. Johansen, testified in support of Hull's claim. PeaceHealth presented testimony by several physicians, including Dr. Kremer, a retired vascular surgeon. He reviewed Hull's medical records and performed a one-time partial evaluation of Hull in September 2012, nearly three years after her second thoracic outlet syndrome surgery. Dr. Kremer testified that Hull never had thoracic outlet syndrome and even if she did, it was not caused by her working conditions.

The IAJ issued a proposed decision and order on October 6, 2014 upholding the Department's orders directing PeaceHealth to pay for complications from Hull's thoracic outlet syndrome. PeaceHealth filed a petition for review. The Board denied the petition for review and adopted the IAJ's proposed decision. The decision and order upheld the Department's determination that Hull's thoracic outlet syndrome arose naturally and proximately out of the distinctive conditions of her employment with PeaceHealth, thereby allowing the downstream consequences of her surgeries.

PeaceHealth appealed this decision to Whatcom County Superior Court, which held a bench trial on August 25, 2015 and issued a memorandum decision

overturning the Board and finding in favor of PeaceHealth.[6] The court issued an

order on December 2, 2015 which included the following "Conclusion of Law":

1. The Board of Industrial Insurance Appeals erred in admitting evidence regarding payment of services associated with defendant's thoracic outlet syndrome under Evidence Rule 409 and as such evidence regarding payment of such services is stricken from the record.

. . .

3. Defendant was subsequently diagnosed with a condition of thoracic outlet syndrome for which surgery was recommended and performed April 22, 2009 and December 21, 2009. Defendant's thoracic outlet syndrome did not arise naturally and proximately from the distinctive conditions of her employment with PeaceHealth Medical Group.

. . .

8. The Board of Industrial Insurance Appeals' decision dated December 8, 2014, is reversed.

CP at 823-30. Hull appeals.

## DISCUSSION

The Industrial Insurance Act includes judicial review provisions that are

specific to workers' compensation determinations. The superior court's review of

a Board determination is de novo. RCW 51.52.115. The Board's decision is

prima facie correct, and a party attacking the decision must support its challenge

by a preponderance of the evidence. Rogers v. Dep't of Labor & Indus., 151 Wn.

App. 174, 180, 210 P.3d 355 (2009) (citing Ruse v. Dep't of Labor & Indus., 138

Wn.2d 1, 5, 977 P.2d 570 (1999)). By contrast, this court reviews the superior

court's decision under the ordinary standard of review for civil cases. "We review

whether substantial evidence supports the trial court's factual findings and then

review, de novo, whether the trial court's conclusions of law flow from the

---

[6] The memorandum decision is not in the record.

6

findings." Watson v. Dep't of Labor & Indus., 133 Wn. App. 903, 909, 138 P.3d 177 (2006) (citing Ruse, 138 Wn.2d at 5; RCW 51.52.115).

The Industrial Insurance Act (IIA) provides that a worker suffering disability from an occupational disease shall receive benefits under the Act. RCW 51.32.180. An occupational disease is defined as "such disease or infection as arises naturally and proximately out of employment." RCW 51.08.140. "[A] worker must establish that his or her occupational disease came about as a matter of course as a natural consequence or incident of distinctive conditions of his or her particular employment." Dennis v. Dep't of Labor & Indus., 109 Wn.2d 467, 481, 745 P.2d 1295 (1987). "The causal connection between a claimant's physical condition and his or her employment must be established by competent medical testimony which shows that the disease is probably, as opposed to possibly, caused by the employment." Id. at 477 (citing Ehman v. Dep't of Labor & Indus., 33 Wn.2d 584, 206 P.2d 787 (1949)). The disease is not "proximate" if there is an intervening, independent and sufficient cause for disease, so that it would not have been contracted but for working conditions. Simpson Logging Co. v. Dep't of Labor & Indus., 32 Wn.2d 472, 202 P.2d 448 (1949). "A physician's opinion as to the cause of the claimant's disease is sufficient when it is based on reasonable medical certainty even though the doctor cannot rule out all other possible causes. . . ." Intalco Aluminum v. Dep't of Labor & Indus., 66 Wn. App. 644, 654-55, 833 P.2d 390 (1992) (citing Halder v. Dep't of Labor & Indus., 44 Wn.2d 537, 543-45, 268 P.2d 1020 (1954)). "The evidence is sufficient to prove causation if, from the facts and circumstances and the medical testimony given, a reasonable

person can infer that a causal connection exists." Id. at 655 (citing Douglas v. Freeman, 117 Wn.2d 242, 252, 814 P.2d 1160 (1991)). In a worker's compensation dispute, special consideration should be given to the opinion of a worker's attending physician. Hamilton v. Dep't of Labor & Indus., 111 Wn.2d 569, 761 P.2d 618 (1988). The trier of fact needn't give more weight or credibility to the attending physician's testimony, but must give it careful thought. Id. at 571.

In this case, the record shows that Hull began feeling symptoms of what was eventually diagnosed as thoracic outlet syndrome either during, or immediately following, her employment with PeaceHealth. She testified that she began feeling pain in her shoulder about five months after filing the claim for her elbow condition and that in those five months she continued to work.[7] During this time at work, she used her shoulders more in order to reduce the pain in her elbows caused by extending her arms. Expert medical testimony confirms that Hull should feel thoracic outlet syndrome symptoms concurrently with the work activity that caused the condition. There is no evidence of an intervening cause of her shoulder pain.

Hull's attending physician, Dr. Johansen, explained how Hull's particular job duties caused thoracic outlet syndrome.[8] He testified that repetitive out in front use of her arms and overhead work such as that performed by Hull is a

---

[7] Hull's work history is incomplete in the record. She testified that she worked for St Joseph's starting in 1990 or 1991, and worked there for 19 years and 11 months. Therefore, she was an employee of St. Joseph's until 2010 or 2011. Once she started feeling symptoms in her shoulder, there is no information in the record about whether she worked continuously.

[8] Dr. Johansen performs the majority of thoracic outlet syndrome surgeries in Washington State and authored chapters in a medical textbook on neurogenic thoracic outlet syndrome.

cause of thoracic outlet syndrome. Hull's body habitus and height made her more susceptible to injury in these work conditions. Her elbow problems indicated that her work activities were causing repetitive motion injuries. Under Hamilton, "special consideration" should be given to Dr. Johansen's testimony as Hull's attending physician. There is no indication that the trial court gave such special consideration. It did not make a finding that PeaceHealth's experts were persuasive or that Dr. Johansen was not credible.

PeaceHealth offered testimony by forensic physicians that does not provide substantial evidence that Hull's thoracic outlet syndrome was not caused by her work activity. One expert, Dr. Madhani, deferred on the cause of Hull's thoracic outlet syndrome. Another expert, Dr. Kremer, testified that the working conditions of hairdressers and carpenters would cause thoracic outlet syndrome, but he denied that Hull's out in front and overhead use of her arms caused it. Dr. Kremer points to electrodiagnostic testing from February 2007 that was negative for thoracic outlet syndrome. However, this test was before Hull reported shoulder pain, and is not reliable to rule out intermittent thoracic outlet syndrome.[9]

If thoracic outlet syndrome is an allowed occupational disease, then the downstream complications of Hull's surgeries, the sequelae, are also allowed. Claimants must be reimbursed "[u]pon the occurrence of any injury to a worker

---

[9] PeaceHealth also argues that Hull's injury must have occurred prior to when the claim was allowed by the Department, but they erroneously cite December 3, 2006 as the date the claim was allowed. In fact, it was allowed on December 3, 2007 and Hull did complain of shoulder problems prior to that date.

entitled to compensation. . . ." RCW 51.36.010(2)(a). Compensation is required for all "proper and necessary medical and surgical services. . . ." Id. Proper and necessary treatment encompasses conditions secondary to the occupational disease, such as complications from surgery. See Anderson v. Allison, 12 Wn.2d 487, 122 P.2d 484 (1942).

PeaceHealth concedes that Hull's balance problems, pulmonary condition, dysphagia, and cricopharyngeal spasms are proximately related to treatment for her thoracic outlet syndrome, and as conditions secondary to thoracic outlet syndrome, they are allowed. PeaceHealth does argue that Hull's adjustment disorder with depressed mood is not proximately related to her surgeries. They support this argument with Dr. Friedman's testimony. However, Dr. Friedman testified that Hull's mental health conditions were not caused by her elbow condition. That is not at issue. The issue is whether her mental health condition was secondary to thoracic outlet syndrome, which is well supported by expert medical testimony. All of Hull's downstream conditions listed in the orders appealed to the Department are allowed.

Lastly, Hull argued that the trial court erred by excluding evidence that PeaceHealth paid for Hull's surgeries. The trial court correctly excluded evidence of payment under ER 409 and our analysis does not incorporate this fact.

We conclude that there is not substantial evidence to support the trial court's finding that Hull's thoracic outlet syndrome and its sequelae did not arise naturally and proximately from her employment with PeaceHealth. As discussed above, the opinions of PeaceHealth's experts are insufficient to support the trial

court's conclusion. In addition, the timeline of Hull's symptoms, her work history and the testimony of her attending physicians strongly support the conclusion that her work activities caused thoracic outlet syndrome. And because the thoracic outlet syndrome was proximately caused by Hull's working conditions, the downstream consequences of her surgery are also covered.

The trial court's order is reversed, the Board's Decision and Order is affirmed and the case is remanded.

Spearman, J.

WE CONCUR:

Trickey, A.C.J.

Leach, J.