[No. 33808. Department One. December 5, 1956.]

MAUDE ALICE ARTHURS, *Respondent,* v. NATIONAL POSTAL TRANSPORT ASSOCIATION, *Appellant.*[1]

[1]Reported in 304 P. (2d) 685.

*Graves, Kizer, Greenough & Gaiser* and *Robert E. Stoeve,* for appellant.

. *Harvey Erickson* and *Frank R. Freeman,* for respondent.

SCHWELLENBACH, J.—October 13, 1953, Walter Roy Arthurs was on duty in the railway mail car of a Northern Pacific train which traveled between Spokane and Coulee City. He was sixty-five years old and had been an employee of the railway mail service for forty-three years. There was in existence at that time beneficiary department certificate No. 19182 of the Railway Mail Association (predecessor of appellant), which entitled Mr. Arthurs' beneficiary to the sum of four thousand dollars if he should die as a result of bodily injuries "through external, violent and accidental means." The certificate contained the usual provisions that no benefit should be payable unless the accident alone resulted in producing visible external marks of injury to the body, nor unless the death or disability resulted wholly from the injury, nor if disease, defect, or bodily infirmity was a contributing cause of death.

On the date mentioned above, at approximately ten o'clock a. m., the train in which Arthurs was on duty collided with a truck at a crossing. As a result of the collision, Arthurs struck the left side of his chest against a mail rack. He was driven back to the Spokane terminal, where he was told to go home and seek the advice of a physician. He drove to the office of Dr. John R. Cole and complained of

pain "over the left side" of his chest. He also had some contusions on his left arm. An X ray was taken, which disclosed a fracture of the left ninth rib. No medication was prescribed, but he was advised to apply heat locally and to wear a chest binder.

He stayed home until October 26th, when he returned to work. He thereafter worked steadily until the evening of November 4th, after which he was not scheduled to return to work until November 9th. On days that he worked, as was his custom, he drove his car to the station in the morning, parked it, and drove home in the evening upon his return from the trip to Coulee City.

As the result of a telephone call, Dr. Cole went to the Arthurs' home Sunday morning, November 9, 1953, between four and five o'clock a. m. Mr. Arthurs was extremely pale and was complaining of sharp and severe substernal pain. Dr. Cole arranged for his immediate removal to the hospital, where he died November 11th at 8:25 a. m. Dr. Cole signed the death certificate, giving the cause of death as "coronary thrombosis."

Prior to the accident on October 13th, Mr. Arthurs had had no history of any heart trouble. According to the testimony of his widow (the plaintiff) and his son, it appeared that he had been in the best of health, was wiry, had tended to the upkeep of three lots, taking care of the lawn, flowers, and landscaping; had shown a marked interest in sports, attending games of many varieties; had done a great deal of reading, had a good disposition, was active socially, and seldom missed a day of work. These witnesses testified that on the day of the accident he exhibited a pale complexion and discoloration of the eyes; that he was visibly shaken and extremely nervous and jumpy; that he spit blood on the day of the accident and on at least one other occasion, the day of his admission to the hospital; that, after the accident, he ate very little at times; that he gave up most of his activities, even his reading; and that the discoloration of his body deepened and spread.

Following the defendant's refusal to pay the benefits al-

legedly due under its certificate, the plaintiff brought this action, alleging that the sole and proximate cause of the coronary thrombosis from which Mr. Arthurs died was the external and accidental injury to the insured arising out of the train collision on October 13, 1953. Defendant in its answer denied that death occurred from accidental means alone, and alleged that disease, defect, or bodily infirmity was a contributing cause.

December 11, 1953, Dr. Cole wrote the following statement:

"To Whom It May Concern:

"Mr. Walter Roy Arthurs died of coronary thrombosis November 11, 1953. He had been involved in a train-car accident October 13, 1952. This may or may not have been a contributary factor.

"Sincerely,
"JOHN R. COLE. [Signed]
"JRC/s JOHN R. COLE, M.D."

November 1, 1954, Dr. Cole wrote a letter to plaintiff's attorney, in which he made the following statement:

"There is a probability, but definitely no certainty, of a relationship between the accident and Mr. Arthurs' subsequent coronary thrombosis."

At the trial, Dr. Cole testified under cross-examination with reference to the statement of December 11, 1953:

"Q. Dr. Cole, that indicates, doesn't it, that you were unable to definitely say one way or the other as to the relationship of the accident and his ultimate death? A. That is true. Q. Now, Dr. Cole, subsequent to the time that was written, has anything occurred that would change your original opinion, that, in effect, you can't say whether there is any relationship between his death and the accident? A. No, nothing has occurred."

Dr. Cole was the only doctor testifying at the trial who had seen the deceased during his lifetime.

Dr. Willis C. Smick, a general practitioner, testified as an expert witness for the plaintiff. In answer to a hypothetical question, he testified:

"A. Very probably the coronary thrombosis was caused by the accident on October 13, 1953."

His answer was based upon the history of the case as related by lay witnesses, upon the X ray, and upon the hospital records. When asked to give reasons for his opinion, he answered that the white blood count, the sedimentation rate, and the temperature of decedent were elevated out of proportion for a coronary thrombosis of eight hours' duration; also:

"Furthermore, there could have been trauma, injury to the lung or to the heart, chest contraction or compression at the time of the accident on October 13th.

"A history of spitting blood on two occasions; once on the 13th and once on the 8th or 9th of November, 13th of October and the 8th or 9th of November, that would indicate that there was an injury to the lung, and possibly to the pulmonic veins which lead to the left side of the heart.

"The thrombus could have been broken loose, formed there in the lung, being injured at the time of the accident of October 13th, and later on it was probably irritated by coughing severely, and then a little microscopic blood clot could have been carried to the left side, along the pulmonic veins, which lead to the left side of the heart, and the thrombus could have been broken loose, gone through the atrum [sic], through the ventricle, out through the aorta and into the coronary artery, carried to the branches leading to the interior lateral branch of the artery, and the blood clot lodged in the left side of the heart, and the electrocardiograph indicated that, as read by Dr. Pickins at the hospital.

"When he spit up the blood on October 13th and again on November 8th, both times, would indicate that there was some injury to the lung."

On cross-examination, Dr. Smick testified that the significance of times when the sedimentation rate, white blood count, and temperature began to rise was that it indicated that tissue destruction had begun at some time previous to November 8th; that it would take "several days to several weeks," "three days or more," for the blood sedimentation rate to rise. He testified further that the X ray revealed to him that the fragments of the broken rib were displaced about one-half an inch.

For the defense, Dr. Robert P. Sagerson, a radiologist, testified that the X ray shows that there is little or no dis-

placement—no separation of the bone—and that there is no evidence from the X-ray film of any injury to the lung.

Dr. Arthur M. Clark, Jr., testified that the death was unrelated to the injury; that it was due to a coronary thrombosis, and not to an embolism. As a basis for his opinion, he testified:

"A. There are two main reasons, the first one is that the injury, if it damaged the heart by this fractured rib, that produces symptoms almost immediately, and the patients die within a short while, or have symptoms, it is only a matter of a few days or a few weeks.

"The other reason is that a coronary thrombosis is something that is unpredictable, we don't actually know what initiates them. They occur in ones sleep or when one is in motion, upon and about, and I cannot see that an injury that far preceeding [sic] it would have any bearing on the formation or the cause of the thrombosis. We know that the first damage was done at the time of his attack, which was just before he came into the hospital because the heart reacts when it doesn't get enough oxygen, it pains, and that is the first clew that anything was wrong with the heart, on the night before he came into the hospital. Q. The fact that it began on the evening of November 8th? A. Yes, that is what I mean."

He also testified:

"Q. Dr. Clark, calling your attention to the history in this case, in your opinion could this acute and extensive heart damage have been caused by a microscopic blood clot, loose in the system of the patient on October 13, 1953, which later on traveled through the pulmonic valves and into the heart? A. Where is this one from? Q. A microscopic clot sent through the pulmonic veins as the result of the injury to the heart or lung on October 13, 1953? A. It would be— the answer would be no, qualified by saying that it would be a most remote possibility. Q. What is the basis of your conclusion that it would be a most remote possibility? A. You are assuming that you have an embolus in the coronary artery rather than a blood clot forming there. Q. Yes. A. That is a very, very rare phenomenon. In delving into the subject a bit, I found that in the last review there were only 40 cases of such things occurring in the large coronary arteries and blood vessels of the heart, and of those forty— Q. May I interrupt you there, when you say that there were only forty, in what period of time was that record made?

A. Up until 1941, and which were published in the medical literature. That is all that we have a record of. Q. In all medical history? A. Yes, as recorded, and most of them were from infections of the heart valves, where pieces of the valve would break off and go to the arteries."

Dr. Charles May Anderson testified that there was too long a period between the accident and the death to make the accident a contributing cause; that Mr. Arthurs did not have the usual symptoms that go with a coronary, such as pain in the chest, and shortness of breath; that when he returned to work, if he had had a coronary, pain would have occurred as a result of the exercise arising from the use of his arms and body. He also testified:

"Q. Now, doctor, do you have an opinion as to whether or not it would have been possible for an embolism or a blood clot to have been formed as a result of the fractured rib, which would later be released into the pulmonic veins and ultimately end up in the left ventricle of the heart? A. Yes, I have an opinion. Q. What is that opinion, doctor? A. That I would think it would be so unlikely that I wouldn't consider it at all. Q. What is the basis of your conclusion? A. Because there is no evidence of any damage to the heart here, or sufficient damage to the lung to cause any type of embolism. Q. If an embolism had formed, Dr. Anderson, where would such an embolism end up? A. It would practically always go to the lung, much more often than to the heart. Q. What is the reason for that? A. Because the circulation goes to the lung before it goes to the heart, and the formation of the coronary vessels is such that it would be quite difficult for an embolism to get into the coronary arteries, and we would naturally expect that the embolism would lodge in the lung."

At the close of the plaintiff's evidence, the defendant challenged its sufficiency to warrant a verdict by the jury in plaintiff's favor. The challenge was renewed at the close of defendant's evidence by a motion for a directed verdict.

The motion was denied, and the jury returned a verdict in favor of the plaintiff. Likewise, a motion for judgment n.o.v. or for a new trial was denied, and the trial court entered judgment on the verdict. This appeal follows.

Error is assigned to the trial court's denial of appellant's

motions, and also to its refusal to give a requested instruction. All of the assignments of error, except that relating to the refusal to give the requested instruction, are based upon appellant's contention that there was insufficient evidence to submit to the jury the question of a causal connection between the accident on October 13, 1953, and Arthurs' death of November 11, 1953.

When the verdict of a jury is attacked on the ground that it is not supported by the record, the court is not concerned with the preponderance of the evidence, but only with the question of the sufficiency of the evidence, to support the verdict. *Ehman v. Department of Labor & Industries*, 33 Wn. (2d) 584, 206 P. (2d) 787.

In passing upon the sufficiency of the evidence to take the case to the jury, there is no element of discretion, but the case must be submitted if there is evidence or reasonable inference therefrom to sustain a verdict and if the evidence offers room for a difference of opinion in the minds of reasonable men; and the verdict, in so far as the facts are concerned, cannot be questioned by the courts. *Graham v. Police & Firemen's Ins. Ass'n,* 10 Wn. (2d) 288, 116 P. (2d) 352.

In such a case, the evidence must be viewed in the light most favorable to the party against whom the motion is made, and all material evidence favorable to the contention of the party benefited by the verdict must be taken as true. *Ruff v. Fruit Delivery Co.*, 22 Wn. (2d) 708, 157 P. (2d) 730. Evidence sufficient to support a verdict must be substantial; and by "substantial evidence" is meant that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed. *Ruff v. Fruit Delivery Co., supra.*

The jury is the sole judge of the credibility and weight of the evidence. *Heitfeld v. B. P. O. K.,* 36 Wn. (2d) 685, 220 P. (2d) 655, 18 A. L. R. (2d) 983; *Rettinger v. Bresnahan,* 42 Wn. (2d) 631, 257 P. (2d) 633.

■■ Although, in determining the cause of death, great weight must be accorded to the evidence of physicians, the testimony of nonexperts may be considered when it is based upon observation; and in cases where the information is the result of familiar association, a layman may testify to disposition, appearance, and physical condition of an individual. *Graham v. Police & Firemen's Ins. Ass'n,* *supra.* Expert medical testimony that there is a possibility of a causal connection between an injury and a death is not sufficient, but it must be made to appear that the injury probably resulted in the death. See *White v. Department of Labor & Industries,* 41 Wn. (2d) 276, 248 P. (2d) 566; *Sawyer v. Department of Labor & Industries,* 48 Wn. (2d) 761, 296 P. (2d) 706.

■ Hypothetical questions must be based upon the facts of the case, and the erroneous assumption of a material fact destroys the probative value of an expert opinion given in answer to the question. *Rode v. Department of Labor & Industries,* 47 Wn. (2d) 619, 289 P. (2d) 354. To have this effect, however, the fact must be material. See *Halder v. Department of Labor & Industries,* 44 Wn. (2d) 537, 268 P. (2d) 1020.

With regard to Dr. Smick's interpretation of the hospital records, appellant insists that the witness was in error when he stated that the decedent's temperature went "way up" an hour or so after admission to the hospital, and that it rose to 102 degrees. The contention is that the temperature was exactly normal at the time of admittance and that it reached only 101.8 degrees. Granting the truth of this contention, we fail to see its merit. The records themselves show that the temperature had risen within an hour or two after admission and that it did reach approximately 102 degrees. Furthermore, appellant's witness, Dr. Clark, testified that these temperatures were always taken orally during the first day, and that the rectal temperature would be higher by one degree. All of the testimony, and the records themselves, were before the jury, which could determine whether or not to believe Dr. Smick's testimony.

The other alleged misinterpretation relates to the time when the blood sedimentation rate was tested. The hospital records show that the test was ordered on the 10th, the day following Mr. Arthurs' admission to the hospital, and that it was reported on the 11th, the day of his death. Dr. Smick apparently assumed that it was taken eight hours after the onset of the coronary attack. Dr. Anderson, appellant's witness, indicated that there was a mistake on the record as to the date on which this test was taken. Under cross-examination, however, he testified that he would have to assume that the test was taken on the day it was reported. Again, the jury had the records before it, as well as the testimony.

Notwithstanding the importance which Dr. Smick at first attached to these records, in the light of all the evidence the error does not seem sufficiently material, as a matter of law, to invalidate his expert opinion based upon the hypothetical question. Even if the testimony of the witness was inconsistent in some particulars, the question would still be one for the jury because the respondent was entitled to that version of the evidence which was most favorable to her. *Halder v. Department of Labor & Industries, supra.*

From what we have stated above, we do not deem it necessary to discuss the refusal to submit appellant's proposed instruction.

The main contention of appellant is that Dr. Smick's testimony that an embolus "could have" broken loose and ultimately have lodged in the left side of the heart, was based upon speculation and surmise, and not upon any probability. Under cross-examination, he testified:

"Q. You didn't have an autopsy here, to be able to say that there was no arteriosclerosis, so you say it must have been a clot, therefore. You just had to exercise your best judgment, isn't that true, doctor? A. When there is a history of trauma to the lung, or a fracture in the left chest, and the blood clot is on the left side of the heart, in that vicinity, I have pretty good evidence for the conclusion that this man had a coronary thrombosis due to a traumatic event at some time previous. Q. Do you think that evidence

gives you enough basis to proceed upon, and from which you think it is more than just something that is barely possible, a bare possibility? A. It is more than a bare possibility. Q. In your opinion you think it is somewhere between a possibility and a probability? A. It was a probability."

Dr. Clark testified for the appellant that medical journals reported that in all medical history there were recorded only forty cases of an embolism traveling through the pulmonic valves and into the heart. Apparently, Dr. Smick felt that this was the forty-first case. The trial court may not have agreed with Dr. Smick's conclusion. We may not agree with it. But we cannot say, in the light of the evidence, that it was based upon surmise or conjecture.

▪ Our problem is whether or not there was sufficient evidence to go to the jury. Whether Dr. Smick, or the three doctors testifying for appellant, were correct in their medical conclusions, is not for us to determine. All of the doctors were qualified. Their testimony was conflicting. Under all the evidence, it became a question for the jury to decide whether or not the death of Mr. Arthurs resulted proximately and wholly from the injury received in the accident of October 13, 1953.

The judgment is affirmed.

DONWORTH, C. J., FINLEY, ROSELLINI, and FOSTER, JJ., concur.