[No. 36393. Department One. May 9, 1963.]

GEORGE E. HELMAN *et al., Respondents,* v. SACRED HEART HOSPITAL, *Appellant.**

---

* Reported in 381 P. (2d) 605.

*John D. MacGillivray* and *Paul F. Schiffner*, for appellant.

*Etter & Connelly* and *William L. Bennett*, for respondents.

HALE, J.—Plaintiff husband[1] brought this action to recover for injuries claimed as a result of a staphylococcus infection contracted while in the hospital. The jury returned a verdict for $67,839.97. Defendant appeals.

George E. Helman was injured in an automobile accident on July 4, 1957, near Wallace, Idaho. His chest was crushed, his left hip was dislocated, and he had multiple fractures in the area of the left hip socket and left pelvic region. After nearly a month in the hospital at Wallace, respondent was

---

[1] Mrs. Helman was joined as a party plaintiff. However, for purposes of appeal, George E. Helman will be referred to as the sole respondent.

transferred to Sacred Heart Hospital, the appellant herein, under the care of two orthopedic surgeons for purposes of hip surgery.

At the hospital, respondent was placed in a two-bed ward; the other bed was occupied by Robert Hagerup, who had been admitted to the hospital with a fractured back on July 9, 1957. He was paralyzed from the waist down.

Extensive surgery was performed on respondent's hip on August 1, 1957; following surgery, respondent was returned to the room shared with patient Hagerup.

On August 9, 1957, Mr. Hagerup complained of a boil under his right arm, and hot compresses were applied. The next day, purulent drainage from the boil appeared. A culture from this drainage was submitted to the hospital laboratory, and, on August 13th, the laboratory reported that the drainage was staphylococcus aureous coagulase positive. Mr. Hagerup was immediately removed to an isolation ward.

The first day following surgery, on August 2nd, respondent developed what was known as a "spiking septic fever," the temperature chart of which shows inclines and declines graphically resembling a spike. Between August 10th, the date at which drainage occurred from the boil on Hagerup's arm, and August 13th, when he was removed from Helman's room to an isolation ward, nurses and hospital attendants administered regularly to both bed patients. The nurses and attendants moved from one patient to the other, changed sheets, gave sponge baths, changed dressings, administered back rubs, and, in general carried out the necessary hospital routine for the care of the two men. They did not observe the sterile techniques prescribed by the hospital in cases where infection is suspected; they did not wash their hands or leave the room between administering to the patients.

On August 13th, the day when Mr. Hagerup was placed in isolation, respondent's surgical wound erupted, discharging a large amount of purulent drainage. A culture of this drainage showed it to have been caused by the presence of staphylococcus aureous coagulase positive. The infection penetrated into respondent's hip socket, destroying bone, tissue and ligaments, so that a second operation was per-

formed on October 28, 1957. In this operation, the respondent's hip was fused in a nearly immovable position. He was discharged from appellant hospital on March 14, 1958, and received further home and office care by his attending physician. His action for injuries and damages arising from the staphylococcus infection resulted in a jury verdict in the amount of $67,839.97.

The foregoing brief narrative does not disclose the real issues here. Principal among appellant's assignments of error are denial of motions for directed verdict at the close of all evidence and for judgment notwithstanding the verdict, and the denial by the court to strike the answer given to a hypothetical question. A more detailed recital of the evidence is necessary to a better understanding of the issues raised by this appeal.

Crucial to an important aspect of the case is the question of the sufficiency of the evidence. Implicit in the broad matter of sufficiency lies the specific query: Did respondent show, by substantial, believable evidence, that he acquired his injuries through a cross infection from his roommate, Hagerup? Essential to this finding is proof that the two patients were infected with the same strain of staphylococcus aureous coagulase positive. It is undisputed that cross infection between patients would be a medical impossibility unless it was of the same strain.

Appellant urges that the evidence not only fails to give proof of cross infection from Hagerup to Helman but actually shows affirmatively that the strains of bacteria were different, thus exonerating the hospital conclusively. If either proposition inheres in the entire evidence, appellant must prevail here. Conversely, if there was sufficient evidence from which the jury could reasonably infer cross infection, appellant's pertinent assignments of error do not lie.

From comprehensive medical testimony, certain medical facts emerge: *Staphylococcus,* a type of germ, is common to all mankind, is present in some form or another in all of us, and is always around us—on nearly everything we touch, in the air we breathe. It is visible under the micro-

scope, but seeing it does not enable the scientist to identify the strain. *Aureous* refers to color, yellow or orange. *Coagulase positive* describes a broad group of organisms in the staphylococcus family which are capable of producing infection, *i.e.*, virulent. There exists in nature some 30 to 50 strains of staphylococcus aureous coagulase positive, some of which have not yet been categorically identified. One strain of this bacteria cannot induce cross infection of a different strain of the same organism. If the strains are different, the infection has come from different sources.

All modern, well-run hospitals, of which appellant is one, are alert to the dangers of cross infection by staphylococcus aureous coagulase positive among their patients, and the injuries caused by it. They maintain infection committees among medical personnel to trace infections and isolate the sources. Personnel are instructed to observe certain sterile techniques in handling patients suspected of being hosts to staphylococcus aureous coagulase positive in a communicable form. If a person placed his hands in an area near or in the vicinity of an open sore or wound containing this kind of bacteria and then later placed his hands on another patient, he would likely expose the second patient to a massive transfer of the bacteria. Massive transfer would involve many millions or possibly billions of the bacteria. Thus, a massive exposure from one patient to another can occur by transmission of the bacteria on a person's hands. Appellant hospital had rules in effect requiring isolation of all patients known to be infected with staphylococcus and requiring all medical personnel to report open sores, boils and pimples, which emitted purulent drainage, among both patients and hospital personnel.

Two tests were described in the evidence as being used to identify and classify these bacteria for medical purposes, and are pertinent to this case:

(1) The antibiogram sensitivity test is employed to ascertain which particular antibiotic chemical substances may be used to combat a bacteria infection. In this sensitivity test, cultures are made under ideal environmental conditions in the laboratory from staphylococci contained in bodily

substances or drainage, and are induced to grow profusely in colonies. Discs impregnated with antibiotic medicines are placed in close contact with these colonies of cultured bacteria. From the reaction of the colonies to the different discs, the scientist can estimate the degree of sensitivity of the bacteria to a specific antibiotic substance. Inhibitions of growth and rate of growth are the determinants. Sensitivity is graded from Nos. 1 to 4, with No. 1 indicating the greater sensitivity and No. 4 the smaller. From the antibiogram, the treating physician can ascertain the particular antibiotic medicine he will prescribe. This test is regularly employed in all large hospitals and was used by Sacred Heart Hospital.

(2) The phage test, the second test pertinent here, is a more sophisticated and precise method for identifying the strains of staphylococcus aureous coagulase positive. Phage is another name for virus. Phages are viruses and produce such diseases as polio, rabies and smallpox. They breed in bacteria. Peculiar to them is the characteristic that they attack staphylococci organisms causing them to dissolve or melt away. By applying these known phages or viruses to the strains of staphylococci sought to be identified, a definitive result is obtained with such preciseness as to warrant giving the identification a classification number. So standardized has the phage test become, that the results in identifying the strains of staphylococcus aureous coagulase positive will be reported to the investigator by their phage numbers.

The phage-type test is not generally employed in hospitals, but is used principally by governmental and centralized agencies for epidemiological investigations, that is, to locate the sources of staphylococci infections which threaten to reach epidemic proportions. Laboratories which conduct phage-type testing are located at the medical school at the University of Washington and at Washington State University. In our neighboring state of Idaho, the state department of health maintains a laboratory at Boise which conducts phage-type tests. These laboratories, among others, stand ready to serve hospitals and other agencies that are

unable to locate the source of a staphylococcus infection among their own precincts. Phage-type testing, unlike the antibiogram tests, is not a normal therapeutic tool, but is used largely in broad investigations of a particular institution or area.

Concerning the accuracy and definitive quality of the results obtained from the two types of tests, different viewpoints were expressed by competent and well-qualified witnesses. While the opinions set forth all had a broad area of general agreement, nevertheless, they shaded one way or the other as to the reliability of the two tests. The doctors of medicine, a bacteriologist from Sacred Heart Hospital, and a professor of microbiology from the medical school at the University of Washington attributed definitive qualities to the antibiogram sensitivity test which respondent's witness, Mr. A. W. Klotz, head of the bacteriological laboratory for the Idaho State Department of Health found lacking.

Experts whose opinions shaded strongly toward the antibiogram test agreed that, although it was employed as a therapeutic tool to aid the treating physician in deciding which particular antibiotic medicine to prescribe, if a sufficient number of antibiotic substances were employed, the test then became a strong one to indicate which strains of staphylococci were present. Mr. Klotz, on rebuttal, testified to the contrary, however; he testified that, in the laboratories over which he supervises, thousands of phage tests and sensitivity tests have been run; that his laboratories are reporting agencies for the United States Department of Health, Welfare and Education, and the World Health Organization; and that he did not believe that the sensitivity tests gave a reliable basis for determining strains of staphylococcus. Mr. Klotz held to the opinion that the only purpose of the antibiotic sensitivity test was to aid the physician in determining the best antibiotic to use on a particular patient. His laboratories never use this test to ascertain a strain of staphylococcus. In his opinion, the sensitivity test is unreliable in determining strains because it is subject to too many variables: (1) Discs on different days have differ-

ent batches of media. (2) Incubation temperatures may differ a little from day to day and this affects the rate of growth of the colonies. (3) Patients differ in the sensitivity pattern of the strains because of the various kinds of antibiotics which they have been given. (4) The test itself is not designed to identify strains of staphylococci. Identification under the sensitivity test becomes a matter of interpretation based upon the differing rates of growth and the inhibiting effects of the antibiotic used, and all of the variables present in the laboratory will affect and change the growth pattern. (5) After thousands of tests in the Idaho laboratories, he has found no significant correlation between the phage patterns and the antibiotic sensitivity patterns. In his opinion, there was the "greatest of probability" that cross infection occurred from Hagerup to Helman.

Appellant's view of the evidence impels it to the position that, within this wealth of medical evidence, the essential ingredients upon which to establish liability are lacking. It holds that there is no evidence of cross infection from the patient Hagerup to the respondent Helman; that both the court and the jury were lured into the very error condemned by this court in *Prentice Packing & Storage Co. v. United Pac. Ins. Co.*, 5 Wn (2d) 144, 106 P. (2d) 314.

In that case, damage was caused by the rupture of a refrigeration pipe carrying ammonia gas. All of the witnesses agreed that the pipe could not have ruptured unless some portion of it had worn to a thinness of one ten-thousandth of an inch or less. Since no proof was given that the pipe at any point had thinned to such a dimension, this court held that proof of that fact could not be inferred merely from proof of the escapement of the ammonia gas. To hold otherwise would have allowed an inference upon an inference, and would have committed this court to approving the establishment of a major premise by reasoning in a circle.

Proceeding from the agreed premise of all of the experts that an individual infected by a particular strain of staphylococcus aureous coagulase positive cannot communicate to

another an entirely different strain of the same organism, appellant urges that there is a failure of proof here upon which liability can be inferred. Appellant takes the position that proof must be adduced to show that the strain infecting Hagerup and Helman was the same. It urges that, since the record is devoid of such proof, the verdict is founded on speculation and, therefore, cannot stand; that the cross infection is simply an idea founded on an inference and nowhere proved; and that the idea is thus controlled by *Prentice Packing & Storage Co. v. United Pac. Ins. Co., supra.* It asserts that both court and jury would have to reason in a circle to arrive at the conclusion that cross infection took place: Hagerup had a staphylococcus infection; later, Helman had a staphylococcus infection; assume that Helman's bacteria was of the same strain as Hagerup's to complete the circle of reasoning. Eliminate the assumption or inference that the strain was the same, and the circle of reasoning is broken; or, assume the existence of the cross infection, and thereby establish that the strain was the same.

Nearly all of the expert witnesses had studied the antibiograms (sensitivity test reports), and gave their conclusions therefrom on both direct and cross-examination. For convenience, we have collated the three antibiograms into one chart, showing tests made from drainage from Hagerup's boil on August 13th, Helman's left hip on August 15th, and Helman's chest on August 27th.

The numbers assigned to measure each reaction in the antibiogram are qualitative rather than quantitative. They are based on the laboratory technologist's estimate of the rate of growth, or inhibition of growth, as shown on the culture plates. From his education and experiences, the technologist gives each reaction a number which conveys his opinion and interpretation of the strain's sensitivity to the several antibiotics used. We assume from the evidence that these reactions were calculated from visual impressions, and do not convey the specific growth or lack of growth by weight in milligrams or fractions thereof.

| | Hagerup Axillary Region 8/13/57 | Helman Left Hip 8/15/57 | Helman Chest Drainage 8/27/57 |
|---|---|---|---|
| Sulfadiazine | 0* | 0* | 0* |
| Triple sulfa | 0 | 0 | 0 |
| Gantrisin | 0 | 0 | 0 |
| Streptomycin | 0 | 0 | 0 |
| Dihydro-streptomycin | 0 | 0 | 0 |
| Terramycin | 0 | 0 | 0 |
| Aureomycin | 0 | 0 | 0 |
| Chloromycetin | 0 | 3 | 3 |
| Tetracycline-HCl | 0 | 0 | 0 |
| Penicillin | 0 | 0 | 0 |
| Bacitracin | 3 | 2 | 4 |
| Polymyxin B | 0 | 3 | 0 |
| Magnamycin | 2 | 3 | 4 |
| Erythromycin | 0 | 2 | 3 |
| Neomycin | 1 | 2 | 3 |
| Furadantin | 1 | 2 | 2 |
| Novobiocin | 0 | 1 | Not tested |
| Oleandomycin | 2 | 0 | Not tested |
| Cathomycin | Not tested | Not tested | 1 |
| Matromycin | Not tested | Not tested | 3 |

*We added zeros to indicate a completely negative reaction, whereas the hospital report merely left the spaces blank.

Dr. Ted E. Ludden, a specialist in pathology, testified on direct examination, that, in his opinion, the sensitivity test showed that the strains of staphylococci affecting Hagerup and Helman were different. He testified that this conclusion was based upon his experience, and implied that it was the result of observation, interpretation and reasoning. Many of the strains showed complete resistances to certain antibiotics and, in this regard, might indicate a similar strain.

On cross-examination, Dr. Ludden stated that the bacteriophage-type of procedure is the only reliable tool for tracing the source of a staphylococcus infection, and that the antibiogram or antibiotic sensitivity test is simply a rough guide to therapy.

Dr. John C. Sherris, a professor of microbiology at the University of Washington, stated that the sensitivity tests definitely showed the strains of staphylococci to be different; he admitted, nevertheless, that all of the strains of

staphylococci which he sought to identify in his own laboratory, in pursuance of his own investigations, were phage typed by laboratories other than his own. When Dr. Sherris examined the antibiograms of Helman's hip and chest, he could not determine therefrom that the strains were the same. From an inspection of the two Helman antibiograms, Dr. Sherris stated that it was possible that Helman's chest was infected by one strain of staphylococcus and his hip by a different strain. Divergence of the evidence, only a tiny fragment of which has been set forth in this opinion, is typical of the position taken by the parties in this case.

A study of the record shows that the conclusions uttered by the witnesses on cross-examination were not entirely consistent with their views as expressed on direct. Our analysis, made to ascertain if there is a fatal gap in the evidence rather than to determine the facts in the case, covers all of the evidence. Here are the facts which the jury could have found from circumstantial, but conflicting, evidence:

(1) Patient Hagerup was infected with staphylococcus aureous coagulase positive which exuded in drainage from an open boil or sore.

(2) Respondent was debilitated and run-down physically from his accident and hospitalization.

(3) Both patients had received antibiotics which could affect the antibiograms to some indeterminate but, nevertheless, substantial degree.

(4) Respondent underwent serious surgery on the left hip and was treated for a crushing injury to his chest.

(5) Following the eruption of the boil under the arm of patient Hagerup, nurses and attendants administered indiscriminately to both patients, changing their bedding and dressings and giving them back rubs, without observing sterile techniques or precautions.

(6) Massive transfers of bacteria can be accomplished by coming into contact with infected areas and then touching other persons.

(7) Transmission of staphylococci by touching with the hands is not infrequent; infection from surgery is rare.

(8) Massive transfer of the staphylococci from Hagerup took place when the patients were ministered to by nurses and attendants.

(9) The time element between the eruption of the boil under Hagerup's arm and the eruption of purulent drainage from Helman's surgical wound was sufficient to allow the development and production of the purulent drainage in Helman.

An examination of the three antibiograms shows that the ultimate medical conclusions to be derived therefrom are subject to the interpretation of the professional investigator. When we compare the antibiogram made from the drainage under Hagerup's arm on August 13, 1957, with the antibiogram made from the drainage from Helman's left hip on August 15, 1957, and then compare these two tests with the test from the drainage from Helman's chest on August 27, 1957, the divergences of opinion are understandable. These differences are sometimes great and sometimes slight, even among witnesses sharing a broad consistency of view.

We do not think that the facts as shown at bar fall within the orbit of *Prentice Packing & Storage Co. v. United Pac. Ins. Co., supra,* nor is the final conclusion of the jury based upon an unsupported inference. A determination that respondent was cross infected from his roommate by staphylococcus aureous coagulase positive does not require the court or jury to reason in a circle or to pile inference upon inference.

It follows, then, that the doctrine of the *Prentice* case, *supra,* is not applicable here. We do not have an inference founded upon another inference or conjecture, but rather strong circumstances pointing one way or the other from which the jury could and did find the ultimate facts. In saying this, we are mindful that the so-called "scintilla of evidence" is insufficient; that the evidence must be substantial; that "substantial evidence" means evidence in sufficient quantum to persuade a fair-minded, rational person of the truth of a declared premise. *Ruff v. Fruit Delivery Co.,* 22 Wn. (2d) 708, 157 P. (2d) 730.

■ We are also aware that, while facts may be proved by circumstantial evidence, a verdict may not be founded on mere theory or speculation. The circumstances must be consistent with each other and with the ultimate fact sought to be established. If circumstances proved show equal support to opposing conclusions, or are equally consistent with contradictory hypotheses, they will be held insufficient to establish the ultimate fact. *Schmidt v. Pioneer United Dairies*, 60 Wn. (2d) 271, 373 P. (2d) 764; *Ruff v. Fruit Delivery Co., supra.*

■ If, as we have shown, there was sufficient evidence of believable qualities arising from the direct and cross-examination of all witnesses, the courts ought not to weigh the quantum of evidence to determine if it balances on one side or the other. Weighing the evidence lies exclusively within the province of the jury. This concept has been long established in this state, running from *Helland v. Bridenstine*, 55 Wash. 470, 104 Pac. 626 (1909), to *Seattle-First Nat. Bank v. Rankin*, 59 Wn. (2d) 288, 367 P. (2d) 835 (1962). The *Helland* case, *supra*, bears cogent resemblance to the case at bar. There the claim was asserted by the plaintiff that gonococci were introduced into her in the course of a pelvic examination by use of an unsterilized and unclean medical instrument. The defendant physician countered this evidence with strong proof that the very instrument had been unused for 4 days, that gonococci would not survive during a 4-day interval at evening office temperatures of 50 to 55 degrees Fahrenheit, that the instrument had not been used on a patient infected with gonorrhea for several months, and that the instruments were, in fact, sterilized before each use. This court declared the rule which we think governs the case at bar in the following language:

" . . . The respondent was not required to prove her case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that she show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. . . . " *Helland v. Bridenstine, supra.*

The rule has since been applied in many cases involving medical or hospital treatment. See, *Atkins v. Clein*, 3 Wn. (2d) 168, 100 P. (2d) 1; *Jordan v. Skinner*, 187 Wash. 617, 60 P. (2d) 697; *Cornwell v. Sleicher*, 119 Wash. 573, 205 Pac. 1059.

■■ It was this rule which, we believe, was correctly applied by the trial court in its ruling on the motion for a judgment non obstante veredicto and for a new trial. In considering such a challenge and motion, both the duty and latitude of the trial court and of this court—even where the case is dominated by circumstantial evidence—are quite precisely fixed by our decisions. Distilled from a wealth of juridical material, the rules have been precisely set forth in *Grange v. Finlay*, 58 Wn. (2d) 528, 364 P. (2d) 234:

"Such a motion involves no element of discretion and will not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference from evidence sufficient to sustain the verdict. In ruling on a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the party against whom the motion is made, and all material evidence favorable to the contention of the party benefited by the verdict must be taken as true. If there is substantial evidence supporting the verdict of the jury, as distinguished from a mere scintilla of evidence, the verdict must stand. By 'substantial evidence' is meant that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed. . . ."

To add to or detract from the foregoing expression at this time would, we think, render cloudy that which ought to be clear. Had the court either granted the motion for a judgment non obstante veredicto or sustained the challenge to the evidence, it would have invaded the province of the jury and substituted its judgment for that of the jury in weighing the evidence. *Smith v. American Mail Line*, 58 Wn. (2d) 361, 363 P. (2d) 133. After a careful and painstaking review of all of the evidence and the preparation of a comprehensive memorandum opinion, the trial court properly declined to do so.

Appellant assigns error to the trial court's refusal to strike the answer to a hypothetical question put to witness A. W. Klotz. We would unduly extend this opinion if all of the elements upon which the motion was made were set forth. Before the hypothetical question was propounded to him, it was clearly established that Mr. Klotz was competent to express a professional, scientific opinion on the pertinent subject matter in issue. He had given approximately 10 pages of scientific testimony concerning his views as to the efficacy of the sensitivity and phage-type tests; he testified that he had reviewed the charts, medical records and laboratory reports relative to both Hagerup and Helman. The court allowed appellant a voir dire inquiry as to the extent of this review and as to his knowledge of the medical history of the two patients.

The hypothetical question itself gave rise to seven appropriate objections, each of which, pointing out certain deficiencies, invited and induced revision and re-phrasing by examining counsel. The hypothetical question, the objections, the colloquy between the court and counsel, and the rulings required about 10 pages of the record. Cross-examination of this witness, covering all aspects of the hypothetical question and answer, the witness's understanding of the science of bacteriology as it pertained to this case, his qualifications, a comparison thereof with those of other experts, and a review of the precise steps taken by the witness to learn the facts from which his expert opinion would be drawn, runs another 45 pages. We point out the detailed nature of the hypothetical evidence to show that the trial court allowed appellant wide latitude in a voir dire examination of the expert whose opinion was sought to be deleted, and to demonstrate that each objection to the hypothetical question as it unfolded was thoughtfully considered by the court and ruled upon. Thus, the answer to the hypothetical question, as it was finally stated, came well within the requirements of the following rules:

(1) The hypothetical question must be based upon facts of record; if the question is not supported by the facts of record, it is objectionable.

(2) It should be phrased so as to fairly and comprehensively cover the facts upon which the answer will be based.

(3) If the answer assumes the existence of conditions or circumstances not shown by the evidence, its validity dissolves and it should be stricken.

(4) While the facts upon which the question is based may be subject to conflicting evidence, the answer is not rendered inadmissible if the question fairly incorporates the facts supported by evidence under the examiner's theory of the case.

The trial court has wide discretion to determine if the question and answer come within the above rules and to control and supervise the propounding of hypothetical questions. *Smith v. American Mail Line, supra; Weissman v. Department of Labor & Industries*, 52 Wn. (2d) 477, 326 P. (2d) 743; *Seattle-First Nat. Bank v. Rankin, supra; Arthurs v. National Postal Transport Ass'n*, 49 Wn. (2d) 570, 304 P. (2d) 685.

We think the trial court properly supervised and controlled the propounding of the hypothetical question, and properly denied the motion to strike the answer thereto.

One final assignment of error invites but little comment.

Appellant made objection to a section of the court's instruction on damages which would allow for such medical and hospital expenses as the jury might find, with reasonable certainty to be required in the future. When we consider the respondent's physical condition at the time of trial, his history of medical care and treatment, and his doctor's testimony as to the future requirements, we think that this reference to future medical expenses was appropriate.

The judgment is affirmed.

OTT, C. J., HILL, ROSELLINI, and HUNTER, JJ., concur.

---

June 25, 1963. Petition for rehearing denied.