[No. 54900-6-I. Division One. August 15, 2005.]

THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*, v. MORRISON KNUDSEN, *Appellant*.

*Aaron K. Owada* (of *Northcraft Bigby & Owada, P.C.*), for appellant.

*Robert M. McKenna, Attorney General,* and *Michael K. Hall, Assistant,* for respondent.

¶1 GROSSE, J. — Under the Hazardous Waste Operations and Treatment, Storage, and Disposal Facilities regulations of former chapter 296-62 WAC (1999),[1] employer Morrison Knudsen engaged in "clean-up operations" because its work included capping at the work site and other remediation activities required pursuant to a Federal Consent Decree (consent decree), the Request For Proposal (RFP), and its contract with the Terminal 18 Redevelopment Project (project). Further, at the time Morrison Knudsen worked on the project, Harbor Island was an "uncontrolled hazardous waste site" because it appeared on the Environmental

[1] At the time this case was before the Industrial Appeals Judge, the Board of Industrial Insurance Appeals, and the trial court, the pertinent sections of the Washington Administrative Code (WAC) were former WAC 296-62-300 through -3195 (1999). Subsequently, the hazardous waste rules of WAC 296-62-300 through -3195 were repealed and recodified, with minor amendments not at issue here, as chapter 296-843 WAC. Because the project, the citation, and the appeals were based on the prior provisions of the WAC, the opinion will refer to those rules and regulations.

Protection Agency's National Priorities List of Uncontrolled Hazardous Waste Sites and contained an accumulation of hazardous substances that created a threat to individual health and safety or the environment. We therefore affirm the decision of the trial court and remand this case to the Board of Industrial Insurance Appeals (BIIA) to address the merits of the Citation and Notice issued by the Washington State Department of Labor and Industries (the Department).

## FACTS

¶2 Harbor Island is owned by the Port of Seattle (the Port). Harbor Island was placed on the Environmental Protection Agency's (EPA) National Priorities List (NPL) as a superfund clean-up site in 1983. The site is contaminated with soil and groundwater pollution hazardous waste. In 1993, after lengthy investigations, the EPA issued a Record of Decision (ROD) for Harbor Island containing a detailed description of the soil and groundwater pollution problems and how remediation was to occur. Generally, the clean-up plan (statement of work or SOW) was divided into three activities: (1) excavating and treating highly contaminated "hot spots," the soil that contained the highest levels of organic contamination; (2) capping exposed contaminated soil; and (3) removing petroleum from groundwater. The ROD was amended in 1995 and the consent decree was issued by the United States District Court for the Western District of Washington, Seattle Division on August 2, 1996. The consent decree implemented the terms of the ROD and its Amendment. Included in the documents was the SOW that sets out the required work activities for the remedial actions to be taken on Harbor Island. At least part of the work Morrison Knudsen contracted to do falls within the remedial plan and, thus, the Department issued a Citation and Notice to Morrison Knudsen for violations under Part P of the Hazardous Waste Operations and Treatment, Storage and Disposal Facilities regulations (HAZWOPER).

¶3 The SOW required health and safety plans conforming to the Occupational Safety and Health Administration and EPA requirements. Significantly, these requirements contain provisions identical to rules issued pursuant to the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, contained in former chapter 296-62 WAC, the HAZWOPER.

¶4 The consent decree expressly obligated any of the settling defendants of the ROD to communicate the decree's requirements to any contractor performing work on Harbor Island. The Port was the major settling defendant. The Port agreed that all contracts entered into for work on Harbor Island would be conditioned on conformity with the terms of the consent decree. The Port bore primary responsibility for the remediation activities of the consent decree.

¶5 The Port and Stevedoring Services of America sought to redevelop part of Harbor Island. They established a corporation for the project. The corporation was formed to extend and improve the Port's shipping facility. The project was proposed sometime in 1997. An RFP was submitted in June 1998.

¶6 Before this time, the project had difficulty getting bidders due to known hazardous waste at the site. So the Port had the known "hot spots" on the property cleaned up. The RFP was prepared for three potential bidders and included a list of documents available for inspection including the ROD, the consent decree, and the earlier studies of hazardous and suspect material estimates for the project. The RFP also referred to general conditions concerning the project's responsibility to inspect the site to ascertain the level of hazardous substances present, as well as a bidder's responsibility for disposal of hazardous substances and for the procedures to be followed for the identification and disposal of contaminated soils. The RFP specifically discussed "Hazardous Substances" in section 23.04, the "Other Considerations" section, wherein the project specifically advised bidders of responsibilities for clean up and disposal of problem materials; that the bidders must adhere to the

EPA's agreements with the participants/defendants in the superfund site (contained in the ROD and SOW in the consent decree), and at a minimum meet certain WAC provisions, including that all activities comply with hazardous waste operations regulations of former chapter 296-62 WAC, Part P, where applicable. Hazardous waste training was required given the Port's concerns over hazardous waste exposure. Morrison Knudsen was the successful bidder for the work on the project. Morrison Knudsen received notice to begin work on November 1, 1999.

¶7 Morrison Knudsen contracted to perform redevelopment of selected portions of Harbor Island. The work included building demolition, roadway demolition, railway demolition, installation of new roads and railways, erection of new buildings, removal and replacement of underground utilities, above ground hazardous material abatement, contaminated soil handling for the Port, as well as underground storage tank removal. The contaminated soil handling was contractual support for the Port's soil remediation activities. As noted above, the contract specifically required Morrison Knudsen to agree to the rules of the ROD and the consent decree. There is also testimony that a preconstruction meeting was held in June 1998, where it was said that the project was *not* an environmental clean-up project. But, the RFP made it clear that a portion of the project would include environmental clean up.

*Procedural Background*

¶8 In April 2000, the Department received a complaint against employer Morrison Knudsen for safety and health violations at the Harbor Island work site. The Department began its investigation and inspection within a few days. The Department issued a safety citation against Morrison Knudsen pursuant to WISHA. In Citation 1, the Department alleged that Morrison Knudsen had 31 citation items constituting 10 serious violations of former chapter 296-62 WAC, Part P. In Citation 2, the Department alleged that Morrison Knudsen had four general-type violations. The

Department issued a penalty against Morrison Knudsen in the amount of $48,500.

¶9 After the Department issued the citation, Morrison Knudsen appealed to the BIIA. An administrative hearing was held in December 2001 and February 2002. The main issues there were: (1) whether the project fell within the scope of chapter 296-62 WAC, Part P; and (2) if so, did Morrison Knudsen violate various parts of chapter 296-62 WAC as alleged in the Citation and Notice.

¶10 In a proposed decision and order (PD&O), the industrial appeals judge (IAJ) determined that soils were found to be contaminated and were stockpiled by Morrison Knudsen personnel on the project. The IAJ also indicated that there was no dispute that part of the project involved the capping of soil, a remediation activity ordered to be done in the consent decree. But the IAJ found these activities did not subject Morrison Knudsen under definitions of Part P of the HAZWOPER. Therefore, the IAJ vacated the citation holding that the Part P HAZWOPER contained in former chapter 296-62 WAC, applicable to hazardous waste clean-up operations, did not apply because Morrison Knudsen was involved in a construction project, not a hazardous waste clean-up operation as defined by former WAC 296-62-30003.

¶11 The PD&O included two specific findings and the conclusions derived from that are central to the decision. The findings of the IAJ, Nos. 5 & 6, (based on definition sections of the WACs) state:

5. The worksite was characterized as early as 1993, was controlled and was not an uncontrolled hazardous waste site.

6. The ultimate goal of the redevelopment project at Terminal 18 was to provide the Port of Seattle and Stevedoring Services of America with a facility that worked for them and that met their performance specifications. The ultimate goal of the project was *not* to make the worksite safer for people or the environment. Morrison Knudsen would

have performed the capping work on this job even if the Record of Decision did not require it.

(Emphasis added.)

¶12 The Department timely petitioned the Board for review. In December 2002, the Board issued its Decision and Order affirming the decision of the IAJ, including those findings listed above. Like the IAJ, the Board concluded that the Morrison Knudsen work site was not a "clean-up operation" as defined in former WAC 296-62-30003. The Board also concluded that the work site was not an "uncontrolled hazardous waste site" as defined in the same WAC. The Board concluded that the work performed by Morrison Knudsen was not within the scope and application of WAC 296-62-300, as set out in former WAC 296-62-30001.

¶13 The Department filed a timely appeal of the Board's decision to the King County Superior Court. The court reversed the Board's decision and order, finding that Board findings Nos. 5 and 6 were not supported by substantial evidence in the record and, thus, did not support the conclusions of law entered by the Board. In its findings of fact, conclusions of law, and order, the trial court found that the work was done at an "uncontrolled hazardous waste site" and that Morrison Knudsen was engaging in a "clean-up operation" as defined in Part P. The court remanded the case to the Board with instructions to issue a new decision and order consistent with the trial court's findings. The trial court also ordered the Board to review and decide each alleged violation set forth in the citation, with the exception of one item (Citation 1 Item 10), which the trial court found not to be a violation.

¶14 From this order, Morrison Knudsen appeals.

ANALYSIS

¶15 This court reviews the Board's findings of fact for substantial evidence and then determines whether the Board's conclusions of law are appropriate based on those

factual findings.[2] RCW 49.17.150(1) in pertinent part states:

> The findings of the board or hearing examiner where the board has denied a petition or petitions for review with respect to questions of fact, *if supported by substantial evidence on the record considered as a whole, shall be conclusive.*

(Emphasis added.) Substantial evidence is " 'evidence in sufficient quantum to persuade a fair-minded, rational person of the truth of a declared premise.' "[3]

¶16 However, the scope of the review here is more limited than the usual WISHA appeal. Most courts reviewing a Board decision under WISHA determine whether the underlying citation was correct. But here, the BIIA held that Part P regulations do not apply to Morrison Knudsen's work on the project, so it did not reach a determination of whether Morrison Knudsen violated the regulations/standards.

■■ ¶17 The alleged WISHA violations at issue here are based on standards addressing the HAZWOPER. As noted before, at the time relevant to this case, these regulations appeared at Part P of former chapter 296-62 WAC, the General Occupational Health Standards promulgated by the Department pursuant to RCW 49.17.040. Based on the evidence before the BIIA, we must determine whether the project fell within the scope of Part P.

¶18 Former WAC 296-62-30001 sets out the scope of the regulation.

> (1) Scope. This section covers employers who have employees who work in the following operations:
>
> (a) Clean-up operations required by a governmental body, whether federal, state, local, or other involving hazardous substances that are conducted at uncontrolled hazardous

[2] *Danzer v. Dep't of Labor & Indus.*, 104 Wn. App. 307, 319, 16 P.3d 35 (2000) (citing RCW 49.17.150(1)); *Young v. Dep't of Labor & Indus.*, 81 Wn. App. 123, 128, 913 P.2d 402, *review denied*, 130 Wn.2d 1009 (1996).

[3] *In re Welfare of Snyder*, 85 Wn.2d 182, 185-86, 532 P.2d 278 (1975) (quoting *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 147, 381 P.2d 605 (1963)).

waste sites (including, but not limited to, the EPA's National Priority Site List (NPL), state priority site lists, sites recommended for the EPA NPL, and initial investigations of government identified sites which are conducted before the presence or absence of hazardous substances has been ascertained.

Harbor Island was placed on the NPL and the Port has been ordered under a consent decree to clean up the site. The Port bore primary responsibility for the remediation activities set forth in the consent decree. This supports a determination that the site was a "clean-up operation" subject to the provisions of the WAC. We look to the definition of "clean-up operation" in the WAC, as well as the scope of the project undertaken by Morrison Knudsen. Former WAC 296-62-30003 defines "clean-up operation" as:

> "Clean-up operation" means an operation where hazardous substances are removed, contained, incinerated, neutralized, stabilized, cleared-up, or in any other manner processed or handled *with the ultimate goal of making the site safer for people or the environment.*

(Emphasis added.)

¶19  While the contract between the project and Morrison Knudsen was intended to create a "turnkey" expanded port operation, and did not specifically require Morrison Knudsen to engage in a full-blown hazardous waste clean-up operation, the contract contemplated that hazardous waste would be handled. Even the decision of the IAJ in the BIIA record shows that contaminated soils were found and stockpiled by Morrison Knudsen personnel. The contract included an operation where hazardous substances were "removed, contained, incinerated, neutralized, stabilized, cleared up, or in any other manner processed or handled with the ultimate goal of making the site safer for people or the environment." It is also undisputed that the project involved the capping/paving over soil, a remediation activity ordered in the consent decree. The work as encountered by Morrison Knudsen obliges it to be part of a "clean-up operation" subject to Part P of the WAC.

¶20 Thus, work activity may be covered by Part P based on any part of the activity itself that pertains to clean-up actions, not on any additional, non-clean-up activity that might follow clean up or be performed at the same time. As indicated in the contract between the project and Morrison Knudsen, the Port and those contracting to do work on Harbor Island are obligated to abate the presence of hazardous materials, and as such Part P applies.

¶21 The decision of the IAJ, as affirmed by the BIIA, focuses on the final part of the definition of clean-up operation: "with the ultimate goal of making the site safer for people or the environment." The BIIA determined that the evidence does not support a finding that this project had an ultimate goal of making the site environmentally safer. We disagree. The ultimate goal is to make the site environmentally safer. The IAJ and the BIIA misinterpreted the "ultimate goal" phrase contained in the definition of "clean-up operation," in that the "ultimate goal" is not a modifier to the entire operation, but applies only to the last antecedent "in any other manner processed or handled."[4]

¶22 Here, the EPA placed Harbor Island on the NPL; the placement resulted in a ROD and a consent decree agreed to by the Port. Because Harbor Island was placed on the NPL followed by the ROD and consent decree, any work on the designated site with potential exposure to contaminants brings it within the scope and application of Part P of the WAC. While the EPA indicates that placement on the NPL is not in itself a remedial action, and inclusion on the list does not automatically require a clean up by a site owner,[5] the fact that there is an ROD and consent decree for this location is contrary to the BIIA's conclusion. Thus, this project is a clean-up operation.

■ ¶23 The Department also argues that the BIIA misconstrued the definition of the phrase "uncontrolled hazard-

---

[4] *See In re Sehome Park Care Ctr., Inc.*, 127 Wn.2d 774, 781, 903 P.2d 443 (1995) (regarding the last antecedent rule of statutory construction).

[5] *Eagle-Picher Indus., Inc. v. United States Envtl. Prot. Agency*, 759 F.2d 922, 932 (D.C. Circ. 1985).

ous waste site." There is no dispute that if the Harbor Island site is determined to be an "uncontrolled hazardous waste site" it would be subject to Part P of the WAC. Under WAC 296-62-30003 an uncontrolled hazardous waste site

means an area identified as an uncontrolled hazardous waste site by a governmental body, whether federal, state, local, or other where an accumulation of hazardous substances creates a threat to the health and safety of individuals or the environment or both.

¶24  The Harbor Island site was placed on the NPL due to its accumulation of hazardous substances that create a threat to the health and safety of individuals or the environment. The definition of an uncontrolled hazardous waste site expressly includes NPL sites, and also specifically includes places where an accumulation of hazardous substances creates a threat to individual health and safety and the environment. Contrary to the BIIA's conclusion, there has been a determination that the site contains an accumulation of hazardous substances that creates a threat to the health and safety of individuals or the environment or both. There is no evidence in the record to support a conclusion that Harbor Island does not continue to be a specific threat to the health and safety of individuals or the environment. In fact, admissions by Morrison Knudsen belie its argument that this was not a hazardous waste operation considering its employee training in its safety and health plan and the contract between it and the project.

¶25  Thus, the BIIA's findings and conclusions that the site was characterized and controlled are not supported by substantial facts in the evidence given the HAZWOPER definitions. We therefore affirm the decision of the superior court reversing the decision of the BIIA and remand to the BIIA with instructions to abide by the order of the superior court.

ELLINGTON, A.C.J., and BAKER, J., concur.

Review denied at 156 Wn.2d 1037 (2006).